## McGRAIN *v.* DAUGHERTY.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO.

No. 28. Argued December 5, 1924.—Decided January 17, 1927.

1. Deputies, with authority to execute warrants, may be appointed by the Sergeant-at-Arms of the Senate, under a standing order of the Senate, such appointments being sanctioned by practice and by acts of Congress fixing the compensation of the appointees and providing for its payment. P. 154.

2. Such deputy may serve a warrant of attachment issued by the President of the Senate and addressed only to the Sergeant-at-Arms, in pursuance of a Senate resolution contemplating service by either. P. 155.

3. A warrant of the Senate for attachment of a person who ignored a subpoena from a Senate committee, is supported by oath within the requirement of the Fourth Amendment when based upon the committee's report of the facts of the contumacy, made on the committee's own knowledge and having the sanction of the oath of office of its members. P. 156.

4. Subpoenas issued by a committee of the Senate to bring before it a witness to testify in an investigation authorized by the Senate, are as if issued by the Senate itself. P. 158.

5. Therefore, in case of disobedience, the fact that the subpoena, and the contumacy, related only to testimony sought by a committee, is not a valid objection to a resolution of the Senate, and warrant issued thereon, requiring the defaulting witness to appear before the bar of the Senate itself, then and there to give the desired testimony. P. 158.

6. Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160.

7. This has support in long practice of the houses separately, and in repeated Acts of Congress, all amounting to a practical construction of the Constitution. Pp. 161, 167, 174.

8. The two houses of Congress in their separate relations have not only such powers as are expressly granted them by the Constitution, but also such auxiliary powers as are necessary and appro-

priate to make the express powers effective, but neither is invested with " general " power to inquire into private affairs and compel disclosures. P. 173.

9. A witness may rightfully refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry. P. 176.

10. A resolution of the Senate directing a committee to investigate the administration of the Department of Justice—whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers, specific instances of alleged neglect being recited,—concerned a subject ·on which legislation could be had which would be materially aided by the information which the investigation was calculated to elicit. P. 176.

11. It is to be presumed that the object of the Senate in ordering such an investigation is to aid it in legislating. P. 178.

12. It is not a valid objection to such investigation that it might disclose wrong-doing or crime by a public officer named in the resolution. P. 179.

13. A resolution of the Senate, directing attachment of a witness who had disobeyed a committee subpoena to such an investigation, and declaring that his testimony is sought with the purpose of obtaining " information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper," supports the inference, from the earlier resolution, of a legislative object. The suggestion of " other action " does not overcome the other part of the declaration and thereby invalidate the attachment proceedings. P. 180.

14. In view of the character of the Senate as a continuing body, and its power to continue or revive, with its original functions, the committee before which the investigation herein involved was pending, the question of the legality of the attachment of the respondent as a contumacious witness did not become moot with the expiration of the Congress during which the investigation and the attachment were ordered. P. 180. ·

299 Fed. 620, reversed.

APPEAL from a final order of the District Court, in *habeas corpus,* discharging the respondent, Mally S.

Daugherty, from the custody of John J. McGrain, Deputy
Sergeant at Arms of the Senate, by whom he had been
arrested, as a contumacious witness, under a warrant of
attachment, issued by the President of the Senate in pur-
suance of a Senate resolution.

*Mr. George W. Wickersham,* Special Assistant to the
Attorney General, with whom *Attorney General Stone*
and *Mr. William T. Chantland,* Special Assistant to the
Attorney General, were on the brief, for the appellant.

Each House of Congress has power to conduct an in-
vestigation in aid of its legislative functions, to compel
attendance before it of witnesses and the production of
books and papers which may throw light upon the subject
of inquiry; subject, of course, to protection against the
invasion of such privileges as those against unreasonable
searches and seizures, self-incrimination and the like.
This power is for the purpose of aiding each House more
fitly to discharge its legislative duties.  The investigation
ordered by the Senate resolution of March 1st was of that
character; and the court below erred in the construction
it put upon the resolution and in holding the entire pro-
ceeding void.  For many years it has been the practice
of both Houses of Congress to conduct investigations into
matters of public interest within the general domain of
federal jurisdiction, and to summon witnesses to appear
and give testimony and produce books and papers bear-
ing upon the questions under investigation.  See §§ 102
and 104, Revised Statutes.  The power of the respective
Houses to compel the attendance and testimony of wit-
nesses in order to secure information necessary or useful
to enable them to perform their legislative functions was
thus recognized by law, and defiance of that power made
punishable as a crime against the United States.  This
was without impairing in the slightest the right of a House
to employ the power regarding contempt to compel obedi-

ence to its orders. *In re Chapman,* 166 U. S. 661. The power of each House was asserted from the beginning, not because it was exercised by the House of Commons in England, but because it is " necessary or proper for carrying into execution " the powers vested by the Constitution in Congress, and each House thereof.

In December, 1859, the Senate, by resolution, appointed a committee to inquire into the facts concerning the invasion and seizure of the armory and arsenal at Harper's Ferry and to report facts and recommend legislation, the committee to have power to send for persons and papers. In February, 1860, a resolution was adopted directing the Sergeant-at-Arms to take into his custody the body of Thaddeus Hyatt, and to have the same forthwith before the bar of the Senate to answer as for a contempt of its authority. Pursuant to this resolution, Hyatt was brought before the bar, and a resolution was adopted, after a long debate, by a vote of 44 ayes and 10 noes, directing him to be committed by the Sergeant-at-Arms to the common jail of the District of Columbia, to be kept in close custody until he should signify his willingness to answer the questions propounded by the Senate. Con. Globe, 1st Sess. 36th, pp. 1102, 1105. In upholding the existence of the power, the Senate did not divide on sectional lines, and the vote was overwhelmingly in support of the asserted power.

The question seems never to have been squarely decided in this Court. In some cases, the point was expressly reserved for future decision; in others there are expressions of opinion strongly favoring the existence of the power. *Kilbourn* v. *Thompson,* 103 U. S. 168. See *Burnham* v. *Morrissey,* 14 Gray, (Mass.) 226; *Anderson* v. *Dunn,* 6 Wheat. 204.

The Massachusetts court in the above case did not reach its conclusions from any analogy to the privileges of Parliament, nor from any residuum of power left in

the legislature because not taken away by the state constitution.   The power was recognized as necessary to the functions expressly delegated to the legislature by the constitution.   The same principle is equally applicable to each House of Congress under the Constitution of the United States.

The point was reserved, in *Harriman* v. *Interstate Commerce Comm.*, 211 U. S. 407, and *Henry* v. *Henkel,* 235 U. S. 219.   *Kilbourn* v. *Thompson, supra,* and *Interstate Commerce Comm.* v. *Brimson.* 154 U. S. 447, seem slightly hostile to such a power.   *Marshall* v. *Gordon,* 243 U. S. 521, 543, contains an argumentative dictum in favor of the right.   See the instances of legislative action cited, with approval, on the margin of the report.   Cf: Hinds' Precedents, Vol. 3: 21, 24.

A final proof that the express constitutional grant of certain judicial powers to Congress, or a House thereof, does not negative the implication of further powers of that nature, (See *Anderson* v. *Dunn,* 6 Wheat. at p. 232,) exists in the fact that the Constitution expressly forbids the exercise of the parliamentary judicial power of passing bills of attainder.   Art. I, § 9.   Where there are both express grants and express prohibitions, the application of the principle *expressio unius* is self-contradictory, and so the field is left clear for ordinary implication with no bias *ab initio* against it.

The matter in the *Kilbourn* case was a settled debt, an executed transaction, one that should not be undone by legislative but only by judicial act, if at all, and which was being considered in the District Court which was the proper forum of the bankruptcy proceedings.   *In re Chapman,* 166 U. S. 661, is of value here chiefly for the presumption of validity conceded to the Senate's resolution. The opinion shows that the usual presumption of validity of legislative acts applies to the resolution of a single House, indicates a qualification on the *Kilbourn* case, and

disposes of the District Court's point in the present case, that a legislative purpose was not expressly averred in the original resolution but only in the one directing Daugherty's arrest. It also shows that that case is not to be distinguished on the ground that the proceedings were under the statute, but that the Senate could have proceeded directly.

In *Marshall* v. *Gordon*, 243 U. S. 521, " the contempt relied upon was not intrinsic to the right of the House to preserve the means of discharging its legislative duties " (p. 546). That is to say, while the right to punish contempts obstructing legislation was upheld, the letter sent by Marshall was not deemed to amount to an obstruction.

The rule to be derived from these contempt cases may be summarized thus: in addition to the express power to " punish its members for disorderly behavior," Constitution, Art. I, § 5, each House has an implied power to punish outsiders for contempts; *Anderson* v. *Dunn, supra;* but no such power is implied in aid of a proceeding outside the jurisdiction of the House, *Kilbourn* v. *Thompson, supra;* however, a presumption of validity attaches to a resolution of either House, just as to legislation of both Houses jointly, so that all doubts are to resolved in its favor, *In re Chapman,* and an investigation of a public officer or department is therefore presumed legislative in purpose and therefore valid until the contrary is shown, *Marshall* v. *Gordon, semble.*

The power rests upon the well-settled rule of unexpressed power necessary or proper to the exercise of express powers, being recognized by the Courts as necessarily a part of the constitutional grant. The leading case of course is *McCulloch* v. *Maryland,* 4 Wheat. 316. That the principle of that case justifies the implication in favor of either House of Congress having power to punish contempts, is recognized in *Marshall* v. *Gordon,* p. 537. Multiplication of the cases following *McCulloch* v. *Maryland,* or of the practical arguments to show that the

gathering of information by the compulsion of contempt proceedings is appropriate, if not imperative, for legislation under modern conditions, seems unnecessary.

A similar question arises where boards or commissions exercising delegated legislative power seek to compel testimony and the production of documents in the aid of its exercise. *Harriman* v. *Interstate Commerce Comm.*, 211 U. S. 407, and the language of the majority opinion is qualified by *Smith* v. *Interstate Commerce Comm.*, 245 U. S. 33. While the cases last cited are not controlling, they indicate a trend away from the idea expressed in the earlier cases and the opinion in the court below, that testimony can be compelled only in an investigation into a specific breach of existing law—a judicial inquiry. Furthermore, the case for a House of Congress investigating by its own committee is much stronger than that of an administrative body acting under delegated powers.

The question of the power of either House to compel testimony in aid of legislation has not been decided adversely in any of the inferior federal courts. See *Ex Parte Nugent*, Fed. Cas., 10375 (1848); *In re Pacific Railway Comm.*, 32 Fed., 241; *Henry* v. *Henkel, supra;* and 207 Fed. 805; *Briggs* v. *Mackeller*, 2 Abbott's Practice, N. Y., 30; *United States* v. *Sinclair*, 52 Wash L. Rep. 451 [July, 1924].

A number of state court decisions have upheld the existence of the power here contended for. *Briggs* v. *Mackellar*, 2 Abbott's Practice, N. Y., 30 (1835); *People* v. *Keeler*, 99 N. Y. 463 (1885); *Matter of Barnes*, 204 N. Y. 108 (1912); *Burnham* v. *Morrissey*, 14 Gray 226; *State* v. *Guilbert*, 75 Ohio St. 1, distg.; *State* v. *Brewster*, 89 N. J. L. 658 (1916); *In re Falvey*, 7 Wis. 630 (1858); *Ex parte Parker*, 74 S. C. 466 (1906).

It is submitted that the District Court's distinction between the rule which obtains in States where the whole legislative power is vested in the legislature and those

where all powers not expressly granted are reserved to the people, is wholly unsound in its application to the powers of Congress under the Constitution.    The rule finally worked out by the courts and expressed by Chief Justice White in *Marshall* v. *Gordon, supra,* is based upon the doctrine of the grant by the Constitution of all powers necessary or proper to the use of the powers expressly granted.    Each House has power· to do whatever is customarily· required to enable it intelligently to participate in the making of laws.    Such implied power cannot be reserved to the States, respectively, or to the people, for it can only be exercised by the House itself.    If it be not vested in such House, it exists nowhere.    That it does exist in each House, and constantly has been exercised for nearly a century past, is abundantly demonstrated.

The English cases dealing with the powers of the House of Commons to compel testimony and punish for contempt of its process are interesting as furnishing an historical background but are not otherwise of great importance, their authority having been rejected by the Supreme Court (*Kilbourn* v. *Thompson, supra,*) disregarded in Massachusetts and rejected in New York, both of which uphold the power (*Burnham* v. *Morrissey, supra, People* v. *Keeler,* 99 N. Y. 463, 473,) and rejected in Ohio which denies it (*State* v. *Guilbert, supra,*) *Regina* v. *Paty,* 2 Ld. Raym., 1105; *Murray's case,* 1 Wils. 299; *Brass Crosby's Case,* 3 Wils., 188; *Rex* v. *Flower,* 8 T. R., 314; *Burdett* v. *Abbott,* 14 East, 1; *Stockdale* v. *Hansard,* 9 Ad. & E. 1; *Stockdale* v. *Hansard,* 11 Ad. & E. 253; *Case of Sheriff of Middlesex,* 11 Ad. & E. 273.

Colonial Cases: *Beaumont* v. *Barrett,* 1 Moo. P. C., 59; *Kielley* v. *Carson,* 4 Moo. P. C., 63; *Fenton* v. *Hampton,* 11 Moo. P. C. 347; *Doyle* v. *Falconer,* L. R., 1 P. C., 328; *Ex parte Dansereau,* XIX Lower Canada Jurist, 210; *Ex parte Brown,* 5 B. & S., 280.

The investigation ordered by the Senate, in the course of which the testimony of Appellee and the production of

·books and records of the· bank of which he is president were required, was legislative in its character. The investigation of the Attorney General's office was the exact action ordered. It is impossible .to separate the person occupying that office, and his assistants, from the office; and the resolution of March 1st directed the committee to investigate circumstances and facts concerning the alleged failure of the Attorney General to prosecute and defend cases wherein the Government of the United States was interested, and to inquire into his activities and those of his assistants in the Department, which would in any manner tend to impair their efficiency or influence as representatives of the Government. The resolution of April 26th, by which the issuance of a warrant was ordered to bring the body of the Appellee before the bar of· the Senate, then and there to answer questions pertinent to the matter under inquiry, is predicated upon a recital that "the appearance and testimony of the said M. S. Daugherty is material and necessary in order that the committee may properly execute the functions imposed upon it and may obtain information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper." See *Chapman* case, 166 U. S. 661; *People* v. *Keeler, supra; Kilbourn* v. *Thompson, supra; In re Falvey, supra; People* v. *Webb,* 5 N. Y. Supp., 855; *People* v. *Milliken,* 185 N. Y. 35; *Matter of Barnes, supra;*

The Department of Justice is one of the great executive branches of the Government. It is created by statute (Rev. Stats., Title VIII). The duties of the Attorney General and his assistants are in great measure defined by law. Annually Congress, with the concurrence of both Houses, appropriates large sums of money to be expended for the purpose of enforcing the law or defending the Government against claims in the courts, under the direction of the Attorney General and his assistants. Can it

possibly be said that the discovery of any facts showing the neglect or failure of the Attorney General or his assistants properly to discharge the duties imposed upon them by law cannot be and would not naturally be used by Congress as the basis for new legislation safeguarding the interests of the Government and making more improbable in the future the commission of any illegal or improper acts which might be shown to have been committed in the past? Appellee by refusing to appear in response to either subpoena and be sworn to testify, can only succeed in this case by establishing that the entire proceeding was void as beyond the constitutional powers of the Senate. Questions as to the materiality or relevancy of evidence are for later consideration.

*Messrs. Arthur I. Vorys* and *John P. Phillips,* with whom *Mr. Webb I. Vorys* was on the brief, for the appellee.

The arrest is the result of an attempt of the Senate to vest its committee with judicial power in a case which is not among those specifically enumerated. The court must determine the nature of the power which the Senate is attempting to exercise, and is not concluded by any *post litem* avowal made after the summons was issued, served and resisted, and after a court of competent jurisdiction had enjoined the exercise of the power. In *Kilbourn* v. *Thompson,* 103 U. S. 168, *In re Chapman,* 166 U. S. 661, and *Marshall* v. *Gordon,* 243 U. S. 521, this court examined the resolutions under which the investigations were being conducted and found that they were sufficient to exhibit the nature of the investigations and the purpose of the investigators. But the court is not limited to the formal words of this resolution, for it is the fact which is determinative and which this court must find. What the Senate intends to do and in fact is doing determines the character of its proceeding. It can not

be said that, as the Senate has not declared what it intends to do at the conclusion of the investigation, therefore the investigation is not judicial and not executive, and consequently it must be legislative in character.   Nor that, as the Senate at the end of the investigation can do nothing in a judicial or executive capacity, therefore it must be assumed that its action, if any, will be in a legislative capacity.

The preamble of Senate Resolution No. 157, which clearly indicates its purpose, was stricken out upon final passage of the resolution, not because the purpose of the Senate had changed in any particular but because the Senate did not desire to condemn the Attorney General without a trial.   Throughout the debate upon the resolution the idea recurs constantly that the Attorney General is to be placed on trial.   There is no suggestion of legislative action, or in fact of any action other than the ascertainment of facts with respect to the charges of malfeasance in office of Harry M. Daugherty and the publication of the same for the purpose of forcing him to resign.   Only twice during the whole debate was there any pretense that the investigators were to engage in anything other than a trial of Mr. Daugherty.

The committee has assumed all of the functions of prosecutor, judge and jury with apparently none of the customary rules governing evidence and procedure.   The court, however, need go no further than the resolution which, in apt words, reposes in the investigating committee judicial duties, and judicial duties alone.   The personal cast of the resolution, the inability of the committee to do anything except to try the facts concerning the charges contained in the resolution and the total inability of the Senate to use the findings of the investigating committee for any purpose other than to pillory Harry M. Daugherty before the American people, clearly demonstrate that the proceeding is an attempt to usurp the

judicial function. Of most important significance, is the fact that the first hint of any pretense that this inquisition was being conducted for legislative purposes was the *ex post facto* recital of a "basis for such legislation and other action" in the resolution of April 26, 1924, authorizing a warrant for the arrest of the appellee. This afterthought was inserted after the proceeding and injunction in the Fayette County Court and when the Senate knew that the validity of its resolution had been challenged in that proceeding on the ground that it conferred judicial authority. The Senate of the United States cannot override the constitutional rights of a private citizen by a mere additional word or gesture.

The Senate when acting in its legislative capacity has no power to arrest in order to compel testimony; the Senate can compel testimony only in cases where it has judicial power specifically granted by the Constitution. Any argument which begins with an assertion that citizens owe a duty to give testimony and thereupon asserts that Congress, or a branch thereof, may enforce this duty by its own processes, will result in nullifying the express division of powers among the three branches of government.

At the time our Constitution was adopted the process of arrest resided solely in the judiciary. *Marshall* v. *Gordon,* 243 U. S. 521, 533. In England the power to arrest and punish was retained by the House of Commons because of ancient privilege and prescription and not because of legislative right. The power of arrest has never been accorded to inferior legislative or administrative bodies. In the few instances in which such an attempt has been made, the power has been denied whenever it has been challenged in the courts. *Langenberg* v. *Decker,* 131 Ind. 471; *Re Sims,* 54 Kans. 1; *Kielley* v. *Carson,* 4 Moore P. C. 63; *Fenton* v. *Hampton,* 11 Moore

P. C. 347; *Ex Parte Dansereau,* 19 Lower Canada Jurist, 210.

This Court has never decided that the Congress, or either branch of it, has power, in its legislative capacity, to cause the arrest of a witness in order to compel him to testify. The intimations of the learned jurists to the contrary are so plain that it is impossible to piece out what opposing counsel have called " expressions strongly favoring the existence of the power." *Kilbourn* v. *Thompson,* 103 U. S. 168; *Interstate Commerce Comm.* v. *Brimson,* 154 U. S. 447; *In re Chapman,* 166 U. S. 661; *Harriman* v. *Interstate Commerce Comm.,* 211 U. S. 407; *Marshall* v. *Gordon, supra; Boyd* v. *United States,* 116 U. S. 616; *Ellis* v. *Interstate Commerce Comm.,* 237 U. S. 434; *Federal Trade Comm.* v. *American Tobacco Co.,* 264 U. S. 298; *Ex parte Nugent,* Fed. Cas. 10375; *Re Pacific Ry. Comm.,* 32 Fed. 250; *Smith* v. *Interstate Commerce Comm.,* 245 U. S. 33.

Congress, under the Federal Constitution, has only those powers which are granted to it, but many of the state legislatures differ from the English Parliament only in the degree of their powers, having all powers not expressly or impliedly denied by the state constitutions. From this it follows that the same canons of interpretation do not apply to the state legislatures and the national Congress. *People* v. *Keeler,* 99 N. Y. 463; *Ex Parte Parker,* 74 S. C. 466; *Burnham* v. *Morrissey,* 14 Gray (Mass.) 226; *Whitcomb's Case,* 120 Mass. 118. Those who have contended that the power to compel testimony is a legislative power have urged it as a necessity. The proponents of this argument resort to the famous definition and amplification of the word " necessary " of Mr. Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 306. The reasoning is fallacious and circuitous. Marshall was considering the power of the United States to establish a national bank. He referred to Clause 18

of Article I, § 8 of the Constitution, in which Congress was given power to make laws which shall be necessary and proper for carrying into execution the powers expressly given. He was not implying a grant of power which, because it might be convenient, or appropriate in the exercise of another power, would therefore be permitted to override the constitutional guaranties of the private citizen. In the cases which have followed and adopted Mr. Chief Justice Marshall's definition, no case has implied such a grant from convenience so as to override the express guaranties of the Bill of Rights contained in the first ten Amendments. Not even when Congress is given an express power can that power be exercised in derogation of the express guaranties of individual liberty. *Interstate Commerce Comm.* v. *Brimson,* 154 U. S. 447. If Congress has no such power where there is a specific grant, certainly Congress cannot destroy personal guaranties through any implied grant incidental to the general power to enact laws. The only satisfactory determination of the substantive question in this case should be that the power to arrest a recusant witness is a judicial process and confined to the jurisdiction of the courts, and that the Senate has no power to arrest a recusant witness except in the cases in which the constitution gives the Senate judicial power.

If Congress has power to compel the production of evidence, to aid Congress in formulating further legislation, then Congress, both Houses concurring, must declare its purpose, and the demand for the information. The Senate cannot legislate, and the Senate cannot compel testimony relating to proposed legislation which the Senate alone has in mind. Const., Art. I, § 1; See *State* v. *Guilbert,* 75 O. S. 1.

If a witness may be compelled to testify in order to aid the Senate in the formulation of legislation, then it must be shown what legislation the Senate has in view

and that the evidence sought is pertinent to the subject-matter of legislation under consideration, and the testimony of the witness can be compelled only through judicial process of the court. In order to justify the compulsory discovery of evidence it must appear for what purpose the testimony is sought and the materiality of the evidence must be affirmatively shown. *Federal Trade Comm.* v. *American Tobacco Co.,* 264 U. S. 298; *Hale* v. *Henkel,* 201 U. S. 43. *Matter of Barnes,* 204 N. Y. 108; *United States* v. *Searles,* 25 Wash. L. Rep. 384.

Senate Resolution No. 157 not only does not show what subjects of legislation were in contemplation, but does show the purpose of the investigation, namely, to determine as to the alleged guilt of Harry M. Daugherty. There is nothing in the record to show what proposed subject-matters of legislation were under consideration, and in no way can it be seen that the testimony of the appellee or the books and records of the bank and the accounts of the bank's customer could furnish information that would be useful in framing any legislation shown to have been in the mind of the Senate or of any member thereof.

The warrant issued by the president *pro tempore* of the Senate was not supported by oath or affirmation as required by the Federal Constitution. Even a bench warrant must be supported by oath. No arrest or attachment for contempt can issue from any court where the contempt is constructive or outside of the presence of the court without a supporting affidavit.

The arrest of Mr. Daugherty is illegal for the reason that it was made under a warrant to bring him forcibly before the Senate to answer the Senate's questions before he had been subpoenaed by the Senate and had refused to obey the Senate.

This Court will respect the jurisdiction and order of the state court, and will make no order which may

effectuate a violation of the injunction or conflict with the purpose and spirit of the injunction.

The law does not provide for any deputy Sergeant-at-Arms. If there were such a officer, this warrant could not be executed by him because it is directed to the Sergeant-at-Arms and not to a deputy.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is an appeal from the final order in a proceeding in *habeas corpus* discharging a recusant witness held in custody under process of attachment issued from the United States Senate in the course of an investigation which it was making of the administration of the Department of Justice. A full statement of the case is necessary.

The Department of Justice is one of the great executive departments established by congressional enactment and has charge, among other things, of the initiation and prosecution of all suits, civil and criminal, which may be brought in the right and name of the United States to compel obedience or punish disobedience to its laws, to recover property obtained from it by unlawful or fraudulent means, or to safeguard its rights in other respects; and also of the assertion and protection of its interests when it or its officers are sued by others. The Attorney General is the head of the department, and its functions are all to be exercised under his supervision and direction.[1]

Harry M. Daugherty became the Attorney General March 5, 1921, and held that office until March 28, 1924,

---

[1] Rev. Stats. secs. 346, 350, 359, 360, 361, 362, 367; Judicial Code, secs. 185, 212; c. 382, secs. 3, 5, 25 Stat. 858, 859; c. 647, sec. 4, 26 Stat. 209; c. 3935, 34 Stat. 816; c. 323, sec. 15, 38 Stat. 736; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, 278; *Kern River Co.* v. *United States*, 257 U. S. 147. 155; *Ponzi* v. *Fessenden*, 258 U. S. 254, 262.

when he resigned.   Late in that period various charges
of misfeasance and nonfeasance in the Department of
Justice after he became its supervising head were brought
to the attention of the Senate by individual senators
and made the basis of an insistent demand that the
department be investigated to the end that the practices
and deficiencies which, according to the charges, were
operating to prevent or impair its right administration
might be definitely ascertained and that appropriate and
effective measures might be taken to remedy or eliminate
the evil.   The Senate regarded the charges as grave and
requiring legislative attention and action.   Accordingly
it formulated, passed and invited the House of Repre-
sentatives to pass (and that body did pass) two measures
taking important litigation then in immediate contem-
plation out of the control of the Department of Justice
and placing the same in charge of special counsel to be
appointed by the President [2]; and also adopted a resolu-
tion authorizing and directing a select committee of five
senators—

" to investigate circumstances and facts, and report the
same to the Senate, concerning the alleged failure of
Harry M. Daugherty, Attorney General of the United
States, to prosecute properly violators of the Sherman
Anti-trust Act and the Clayton Act against monopolies
and unlawful restraint of trade; the alleged neglect and
failure of the said Harry M. Daugherty, Attorney Gen-
eral of the United States, to arrest and prosecute Albert
B. Fall, Harry F. Sinclair, E. L. Doheny, C. R. Forbes,
and their co-conspirators in defrauding the Government,
as well as the alleged neglect and failure of the said
Attorney General to arrest and prosecute many others
for violations of Federal statutes, and his alleged failure

[2] Cong. Rec. 68th Cong., 1st Sess., pp. 1520, 1521, 1728; c. 16, 43
Stat. 5; Cong. Rec. 68th Cong., 1st Sess., pp. 1591, 1974; c. 39, 43
Stat. 15; c. 42, 43 Stat. 16.

to prosecute properly, efficiently, and promptly, and to defend, all manner of civil and criminal actions wherein the Government of the United States is interested as a party plaintiff or defendant. And said committee is further directed to inquire into, investigate and report to the Senate the activities of the said Harry M. Daugherty, Attorney General, and any of his assistants in the Department of Justice which would in any manner tend to impair their efficiency or influence as representatives of the Government of the United States."

The resolution also authorized the committee to send for books and papers, to subpoena witnesses, to administer oaths, and to sit at such times and places as it might deem advisable.[3]

In the course of the investigation the committee issued and caused to be duly served on Mally S. Daugherty—who was a brother of Harry M. Daugherty and president of the Midland National Bank of Washington Court House, Ohio,—a subpoena commanding him to appear before the committee for the purpose of giving testimony bearing on the subject under investigation, and to bring with him the " deposit ledgers of the Midland National Bank since November 1, 1920; also note files and transcript of owners of every safety vault; also records of income drafts; also records of any individual account or accounts showing withdrawals of amounts of $25,000 or over during above period." The witness failed to appear.

A little later in the course of the investigation the committee issued and caused to be duly served on the same witness another subpoena commanding him to appear before it for the purpose of giving testimony relating to the subject under consideration—nothing being

---

[3] For the full resolution and two amendments adopted shortly thereafter see Cong. Rec., 68th Cong., 1st Sess., pp. 3299, 3409–3410, 3548, 4126.

said in this subpoena about bringing records, books or papers. The witness again failed to appear; and no excuse was offered by him for either failure.

The committee then made a report to the Senate stating that the subpoenas had been issued, that according to the officer's returns—copies of which accompanied the report—the witness was personally served; and that he had failed and refused to appear.[4] After a reading of the report, the Senate adopted a resolution reciting these facts and proceeding as follows:[5]

"Whereas the appearance and testimony of the said M. S. Daugherty is material and necessary in order that the committee may properly execute the functions imposed upon it and may obtain information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper: Therefore be it

"Resolved, That the President of the Senate pro tempore issue his warrant commanding the Sergeant at Arms or his deputy to take into custody the body of the said M. S. Daugherty wherever found, and to bring the said M. S. Daugherty before the bar of the Senate, then and there to answer such questions pertinent to the matter, under inquiry as the Senate may order the President of the Senate pro tempore to propound; and to keep the said M. S. Daugherty in custody to await the further order of the Senate."

It will be observed from the terms of the resolution that the warrant was to be issued in furtherance of the effort to obtain the personal testimony of the witness and, like the second subpoena, was not intended to exact from him the production of the various records, books and papers named in the first subpoena.

The warrant was issued agreeably to the resolution and was addressed simply to the Sergeant at Arms. That

---

[4] Senate Report No. 475, 68th Cong., 1st Sess.
[5] Cong. Rec., 68th Cong., 1st Sess., pp. 7215–7217.

officer on receiving the warrant endorsed thereon a direction that it be executed by John J. McGrain, already his deputy, and delivered it to him for execution.

The deputy, proceeding under the warrant, took the witness into custody at Cincinnati, Ohio, with the purpose of bringing him before the bar of the Senate as commanded; whereupon the witness petitioned the federal district court in Cincinnati for a writ of *habeas corpus.* The writ was granted and the deputy made due return setting forth the warrant and the cause of the detention. After a hearing the court held the attachment and detention unlawful and discharged the witness, the decision being put on the ground that the Senate in directing the investigation and in ordering the attachment exceeded its powers under the Constitution, 299 Fed. 620. The deputy prayed and was allowed a direct appeal to this Court under § 238 of the Judicial Code as then existing.

We have given the case earnest and prolonged consideration because the principal questions involved are of unusual importance and delicacy. They are (a) whether the Senate—or the House of Representatives, both being on the same plane in this regard—has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution, and (b) whether it sufficiently appears that the process was being employed in this instance to obtain testimony for that purpose.

Other questions are presented which in regular course should be taken up first.

The witness challenges the authority of the deputy to execute the warrant on two grounds—that there was no provision of law for a deputy, and that, even if there were such a provision, a deputy could not execute the

warrant because it was addressed simply to the Sergeant at Arms. We are of opinion that neither ground is tenable.

The Senate adopted in 1889 and has retained ever since a standing order declaring that the Sergeant at Arms may appoint deputies "to serve process or perform other duties" in his stead, that they shall be "officers of the Senate," and that acts done and returns made by them "shall have like effect and be of the same validity as if performed or made by the Sergeant at Arms in person." [6] In actual practice the Senate has given full effect to the order; and Congress has sanctioned the practice under it by recognizing the deputies—sometimes called assistants—as officers of the Senate, by fixing their compensation and by making appropriations to pay them. [7] Thus there was ample provision of law for a deputy.

The fact that the warrant was addressed simply to the Sergeant at Arms is not of special significance. His authority was not to be tested by the warrant alone. Other criteria were to be considered. The standing order and the resolution under which the warrant was issued plainly contemplated that he was to be free to execute the warrant in person or to direct a deputy to execute it. They expressed the intention of the Senate; and the words of the warrant were to be taken, as they well could be, in a sense which would give effect to that intention. Thus understood, the warrant admissibly could be executed by a deputy if the Sergeant at Arms so directed, which he did.

The case of *Sanborn* v. *Carleton,* 15 Gray 399, on which the witness relies, related to a warrant issued to the Sergeant at Arms in 1860, which he deputed another to execute. At that time there was no standing rule or

---

[6] Senate Journal 47, 51–1, Dec. 17, 1889; Senate Rules and Manual, 68th Cong., p. 114.

[7] 41 Stat. 632, 1253; 42 Stat. 424, 1266; 43 Stat. 33, 580, 1288.

statute permitting him to act through a deputy; nor was there anything in the resolution under which the warrant was issued indicative of a purpose to permit him to do so. All that was decided was that in the absence of a permissive provision, in the warrant or elsewhere, he could not commit its execution to another. The provision which was absent in that case and deemed essential is present in this.

The witness points to the provision in the Fourth Amendment to the Constitution declaring " no warrants shall issue but upon probable cause supported by oath- or affirmation " and contends that the warrant was void because the report of the committee on which it was based was unsworn. We think the contention overlooks the relation of the committee to the Senate and to the matters reported, and puts aside the accepted interpretation of the constitutional provision.

. The committee was a part of the Senate, and its members were acting under their oath of office as senators. The matters reported pertained to their proceedings and were within their own knowledge. They had issued the subpoenas, had received and examined the officer's returns thereon (copies of which accompanied the report), and knew the witness had not obeyed either subpoena or offered any excuse for his failure to do so.

· The constitutional provision · was not intended to establish a new principle but to affirm and preserve a cherished rule of the common law designed to prevent the issue of groundless warrants. In legislative practice committee reports are regarded as made under the sanction of the oath of office of its members; and where the matters reported are within the committee's knowledge and constitute probable cause for an attachment such reports are acted on and given effect without requiring that they be supported by further oath or affirmation. This is

not a new practice but one which has come down from an early period. It was well recognized before the constitutional provision was adopted, has been followed ever since, and appears never to have been challenged until now. Thus it amounts to a practical interpretation, long continued, of both the original common law rule and the affirming constitutional provision, and should be given effect accordingly.[8]

The principle underlying the legislative practice has also been recognized and applied in judicial proceedings. This is illustrated by the settled rulings that courts in dealing with contempts committed in their presence may order commitments without other proof than their own knowledge of the occurrence,[9] and that they may issue attachments, based on their own knowledge of the default, where intended witnesses or jurors fail to appear in obedience to process shown by the officer's return to have been duly served.[10] A further illustration is found in the rulings that grand jurors, acting under the sanction of their oaths as such, may find and return indictments based solely on their own knowledge of the particular offenses, and that warrants may be issued on such indictments without further oath or affirmation;[11] and still another is found in the practice which recognizes that where grand jurors, under their oath as such, report to the court that a witness brought before them has refused to testify, the

---

[8] *Prigg* v. *Pennsylvania,* 16 Pet. 539, 620–621; *The Laura,* 114 U. S. 411, 416; *McPherson* v. *Blacker,* 146 U. S. 1, 35–36; *Ex parte Grossman,* 267 U. S. 87, 118; *Myers* v. *United States,* 272 U. S. 52.

[9] *Ex parte Terry,* 128 U. S. 289, 307, *et seq.; Holcomb* v. *Cornish,* 8 Conn. 375; 4 Blackst. Com. 286.

[10] *Robbins* v. *Gorham,* 25 N. Y. 588; *Wilson* v. *State,* 57 Ind. 71.

[11] *Hale* v. *Henkel,* 201 U. S. 43, 60–62; *Regina* v. *Russell,* 2 Car. & Mar. 247; *Commonwealth* v. *Hayden,* 163 Mass. 453, 455; Decision of Mr. Justice Catron reported in Wharton's Cr. Pl. & Pr., 8th ed., pp. 224–226,

court may act on that report, although otherwise unsworn, and order the witness brought before it by attachment.[12]

We think the legislative practice, fortified as it is by the judicial practice, shows that the report of the committee—which was based on the committee's own knowledge and made under the sanction of the oath of office of its members—was sufficiently supported by oath to satisfy the constitutional requirement.

The witness also points to the provision in the warrant and in the resolution under which it was issued requiring that he be "brought before the bar of the Senate, then and there" to give testimony "pertinent to the subject under inquiry," and contends that an essential prerequisite to such an attachment was wanting, because he neither had been subpoenaed to appear and testify before the Senate nor had refused to do so. The argument in support of the contention proceeds on the assumption that the warrant of attachment "is to be treated precisely the same as if no subpoena had been issued by the committee, and the same as if the witness had not refused to testify before the committee." In our opinion the contention and the assumption are both untenable. The committee was acting for the Senate and under its authorization; and therefore the subpoenas which the committee issued and the witness refused to obey are to be treated as if issued by the Senate. The warrant was issued as an auxiliary process to compel him to give the testimony sought by the subpoenas; and its nature in this respect is not affected by the direction that his testimony be given at the bar of the Senate instead of before the committee. If the Senate deemed it proper, in view of his contumacy, to give that direction it was at liberty to do so.

---

[12] See *Hale* v. *Henkel, supra; Blair* v. *United States,* 250 U. S. 273; *Nelson* v. *United States,* 201 U. S. 92, 95; Equity Rule 52, 226 U. S. Appendix, 15: *Heard* v. *Pierce,* 8 Cush. 338.

The witness sets up an interlocutory injunction granted by a state court at Washington Court House, Ohio, in a suit brought by the Midland National Bank against two members of the investigating committee, and contends that the attachment was in violation of that injunction and therefore unlawful. The contention is plainly ill-founded. The injunction was granted the same day the second subpoena was served, but whether earlier or later in the day does not appear. All that the record discloses about the injunction is comprised in the paragraph copied in the margin from the witness's petition for *habeas corpus*.[13] But it is apparent from what is disclosed that the injunction did not purport to place any restraint on the witness, nor to restrain the committee from demanding that he appear and testify personally to what he knew respecting the subject under investigation; and also that what the injunction did purport to restrain has no bearing on the power of the Senate to enforce that demand by attachment.

---

[13] " On the 11th day of April, 1924, in an action in the Court of Common Pleas of said Fayette County, Ohio, in which said The Midland National Bank was plaintiff and said B. K. Wheeler and Smith W. Brookhart were defendants, upon the petition of said bank said court granted a temporary restraining order enjoining and restraining said defendants and their agents, servants, and employees from entering into said banking room and from taking, examining, or investigating any of the books, accounts, records, promissory notes, securities, letters, correspondence, papers, or any other property of said bank or of its depositors, borrowers, or customers in said banking room and from in any manner molesting and interfering with the business and affairs of said bank, its officers, agents, servants, and the business of its depositors, borrowers and customers with said bank until the further order of said court. The said defendants were duly served with process in said action and duly served with copies of said temporary restraining order on said 11th day of April, 1924, and said injunction has not been modified by said court and no further order has been made in said case by said court, and said injunction is in full force and effect."

In approaching the principal questions, which remain to be considered, two observations are in order. One is that we are not now concerned with the direction in the first subpoena that the witness produce various records, books and papers of the Midland National Bank. That direction was not repeated in the second subpoena; and is not sought to be enforced by the attachment. This was recognized by the court below, 299 Fed. 623, and is conceded by counsel for the appellant. The other is that we are not now concerned with the right of the Senate to propound or the duty of the witness to answer specific questions, for as yet no questions have been propounded to him. He is asserting—and is standing on his assertion—that the Senate is without power to interrogate him, even if the questions propounded be pertinent and otherwise legitimate—which for present purposes must be assumed.

The first of the principal questions—the one which the witness particularly presses on our attention—is, as before shown, whether the Senate—or the House of Representatives, both being on the same plane in this regard—has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution.

The Constitution provides for a Congress consisting of a Senate and House of Representatives and invests it with " all legislative powers " granted to the United States, and with power " to make all laws which shall be necessary and proper " for carrying into execution these powers and " all other powers " vested by the Constitution in the United States or in any department or officer thereof. Art. I, secs 1, 8. Other provisions show that, while bills can become laws only after being considered and passed by both houses of Congress, each house is to be distinct

from the other, to have its own officers and rules, and to exercise its legislative function independently.[14]   Art. I, secs. 2, 3, 5, 7.   But there is no provision expressly investing either house with power to make investigations and exact testimony to the end that it may exercise its legislative function advisedly and effectively.   So the question arises whether this power is so far incidental to the legislative function as to be implied.

In actual legislative practice power to secure needed information by such means has long been treated as an attribute of the power to legislate.   It was so regarded in the British Parliament and in the Colonial legislatures before the American Revolution; and a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures.[15]

This power was both asserted and exerted by the House of Representatives in 1792, when it appointed a select committee to inquire into the St. Clair expedition and authorized the committee to send for necessary persons, papers and records.   Mr. Madison, who had taken an important part in framing the Constitution only five years before, and four of his associates in that work, were members of the House of Representatives at the time, and all voted for the inquiry.   3 Cong. Ann. 494.   Other exertions of the power by the House of Representatives, as also by the Senate, are shown in the citations already made.   Among those by the Senate, the inquiry ordered in 1859 respecting the raid by John Brown and his adherents on the armory and arsenal of the United States at Harper's Ferry is of special significance.   The resolution

---

[14] Story Const., secs. 545, *et seq.;* 1 Kent's Com., p. 222.

[15] May's Parliamentary Practice, 2d ed., pp. 80, 295, 299; Cushing's Legislative Practice, secs. 634, 1901–1903; 3 Hinds' Precedents, secs. 1722, 1725, 1727, 1813–1820; Cooley's Constitutional Limitations, 6th ed., p. 161.

directing the inquiry authorized the committee to send
for persons and papers, to inquire into the facts pertain-
ing to the raid and the means by which it was organized
and supported, and to report what legislation, if any, was
necessary to preserve the peace of the country and pro-
tect the public property. The resolution was briefly dis-
cussed and adopted without opposition. Cong. Globe,
36th Cong., 1st Sess., pp. 141, 152. Later on the com-
mittee reported that Thaddeus Hyatt, although subpoe-
naed to appear as a witness, had refused to do so; where-
upon the Senate ordered that he be attached and brought
before it to answer for his refusal. When he was brought
in he answered by challenging the power of the Senate
to direct the inquiry and exact testimony to aid it in
exercising its legislative function. The question of power
thus presented was thoroughly discussed by several sena-
tors—Mr. Sumner of Massachusetts taking the lead in
denying the power and Mr. Fessenden of Maine in sup-
porting it. Sectional and party lines were put aside and
the question was debated and determined with special
regard to principle and precedent. The vote was taken
on a resolution pronouncing the witness's answer insuffi-
cient and directing that he be committed until he should
signify that he was ready and willing to testify. The
resolution was adopted—44 senators voting for it and 10
against. Cong. Globe, 36th Cong., 1st Sess., pp. 1100–
1109, 3006–3007. The arguments advanced in support of
the power are fairly reflected by the following excerpts
from the debate:

Mr. Fessenden of Maine. "Where will you stop? Stop,
I say, just at that point where we have gone far enough to
accomplish the purposes for which we were created; and
these purposes are defined in the Constitution. What are
they? The great purpose is legislation. There are some
other things, but I speak of legislation as the principal
purpose. Now, what do we propose to do here? We

propose to legislate upon a given state of facts, perhaps, or under a given necessity. Well, sir, proposing to legislate, we want information. We have it not ourselves. It is not to be presumed that we know everything; and if any body does presume it, it is a very great mistake, as we know by experience. We want information on certain subjects. How are we to get it? The Senator says, ask for it. I am ready to ask for it; but suppose the person whom we ask will not give it to us: what then? Have we not power to compel him to come before us? Is this power, which has been exercised by Parliament, and by all legislative bodies down to the present day without dispute—the power to inquire into subjects upon which they are disposed to legislate—lost to us? Are we not in the possession of it? Are we deprived of it simply because we hold our power here under a Constitution which defines what our duties are, and what we are called upon to do?

"Congress have appointed committees after committees, time after time, to make inquiries on subjects of legislation. Had we not power to do it? Nobody questioned our authority to do it. We have given them authority to send for persons and papers during the recess. Nobody questioned our authority. We appoint committees during the session, with power to send for persons and papers. Have we not that authority, if necessary to legislation?

\*        \*        \*        \*        \*

"Sir, with regard to myself, all I have to inquire into is: is this a legitimate and proper object, committed to me under the Constitution; and then, as to the mode of accomplishing it, I am ready to use judiciously, calmly, moderately, all the power which I believe is necessary and inherent, in order to do that which I am appointed to do; and, I take it, I violate no rights, either of the people generally or of the individual, by that course."

Mr. Crittenden of Kentucky. " I come now to a question where the coöperation of the two branches is not necessary. There are some things that the Senate may do. How? According to a mode of its own. Are we to ask the other branch of the Legislature to concede by law to us the power of making such an inquiry as we are now making? Has not each branch the right to make what inquiries and investigation it thinks proper to make for its own action? Undoubtedly. You say we must have a law for it. Can we have a law? Is it not, from the very nature of the case, incidental to you as a Senate, if you, as a Senate, have the power of instituting an inquiry and of proceeding with that inquiry? I have endeavored to show that we have that power. We have a right, in consequence of it, a necessary incidental power, to summon witnesses, if witnesses are necessary. Do we require the concurrence of the other House to that? It is a power of our own. If you have a right to do the thing of your own motion, you must have all powers that are necessary to do it.

" The means of carrying into effect by law all the granted powers, is given where legislation is applicable and necessary; but there are subordinate matters, not amounting to laws; there are inquiries of the one House or the other House, which each House has a right to conduct; which each has, from the beginning, exercised the power to conduct; and each has, from the beginning, summoned witnesses. This has been the practice of the Government from the beginning; and if we have a right to summon the witness, all the rest follows as a matter of course."

The deliberate solution of the question on that occasion has been accepted and followed on other occasions by both houses of Congress, and never has been rejected or questioned by either.

The state courts quite generally have held that the power to legislate carries with it by necessary implication ample authority to obtain information needed in the rightful exercise of that power, and to employ compulsory process for the purpose.

In *Burnham* v. *Morrisey*, 14 Gray 226, 239, the Supreme Judicial Court of Massachusetts, in sustaining an exertion of this power by one branch of the legislature of that Commonwealth, said:

" The house of representatives has many duties to perform, which necessarily require it to receive evidence and examine witnesses. . . . It has often occasion to acquire certain knowledge of facts, in order to the proper performance of legislative duties. We therefore think it clear that it has the constitutional right to take evidence, to summon witnesses, and to compel them to appear and testify. This power to summon and examine witnesses it may exercise by means of committees."

In *Wilckens* v. *Willet*, 1 Keyes 521, 525, a case which presented the question whether the House of Representatives of the United States possesses this power, the Court of Appeals of New York said:

" That the power exists there admits of no doubt whatever. It is a necessary incident to the sovereign power of making laws; and its exercise is often indispensable to the great end of enlightened, judicious and wholesome legislation."

In *People* v. *Keeler*, 99 N. Y. 463, 482, 483, where the validity of a statute of New York recognizing and giving effect to this power was drawn in question, the Court of Appeals approvingly quoted what it had said in *Wilckens* v. *Willet,* and added:

" It is difficult to conceive any constitutional objection which can be raised to the provision authorizing legislative committees to take testimony and to summon

witnesses. In many cases it may be indispensable to intelligent and effectual legislation to ascertain the facts which are claimed to give rise to the necessity for such legislation, and the remedy required, and, irrespective of the question whether in the absence of a statute to that effect either house would have the power to imprison a recusant witness, I cannot yield to the claim that a statute authorizing it to enforce its process in that manner is in excess of the legislative power. To await the slow process of indictment and prosecution for a misdemeanor, might prove quite ineffectual, and necessary legislation might be obstructed, and perhaps defeated, if the legislative body had no other and more summary means of enforcing its right to obtain the required information. That the power may be abused, is no ground for denying its existence. It is a limited power, and should be kept within its proper bounds; and, when these are exceeded, a jurisdictional question is presented which is cognizable in the courts."

. . . " Throughout this Union the practice of legislative bodies, and in this State, the statutes existing at the time the present Constitution was adopted, and whose validity has never before been questioned by our courts, afford strong arguments in favor of the recognition of the right of either house to compel the attendance of witnesses for legislative purposes, as one which has been generally conceded to be an appropriate adjunct to the power of legislation, and one which, to say the least, the State legislature has constitutional authority to regulate and enforce by statute."

Other decisions by state courts recognizing and sustaining the legislative practice are found in *Falvey* v. *Massing,* 7 Wis. 630, 635–638; *State* v. *Frear,* 138 Wis. 173; *Ex parte Parker,* 74 S. C. 466, 470; *Sullivan* v. *Hill,* 73 W. Va. 49, 53; *Lowe* v. *Summers,* 69 Mo. App. 637, 649–650. An instructive decision on the question is also found in *Ex parte Dansereau* (1875), 19 L. C. Jur. 210, where the

legislative assembly of the Province of Quebec was held to possess this power as a necessary incident of its power to legislate.

We have referred to the practice of the two houses of Congress; and we now shall notice some significant congressional enactments. May 3, 1798, c. 36, 1 Stat. 554, Congress provided that oaths or affirmations might be administered to witnesses by the President of the Senate, the Speaker of the House of Representatives, the chairman of a committee of the whole, or the chairman of a select committee, " in any case under their examination." February 8, 1817, c. 10, 3 Stat. 345, it enlarged that provision so as to include the chairman of a standing committee. January 24, 1857, c. 19, 11 Stat. 155, it passed "An Act more effectually to enforce the attendance of witnesses on the summons of either house of Congress, and to compel them to discover testimony." This act provided, first, that any person summoned as a witness to give testimony or produce papers in any matter under inquiry before either house of Congress, or any committee of either house, who should wilfully make default, or, if appearing, should refuse to answer any question pertinent to the inquiry, should, in addition to the pains and penalties then existing,[16] be deemed guilty of a misdemeanor and be subject to indictment and punishment as there prescribed; and secondly, that no person should be excused from giving evidence in such an inquiry on the ground that it might tend to incriminate or disgrace him, nor be held to answer criminally, or be subjected to any penalty or forfeiture, for any fact or act as to which he was required to testify, excepting that he might be subjected to prosecution for perjury committed while so testifying. January 24, 1862, c. 11, 12 Stat. 333, Congress modified the immunity provision in particulars not mate-

[16] The reference is to the power of the particular house to deal with the contempt. *In re Chapman*, 166 U. S. 661, 671–672.

rial here.  These enactments are now embodied in §§ 101–104 and 859 of Revised Statutes.  They show very plainly that Congress intended thereby (a) to recognize the power of either house to institute inquiries and exact evidence touching subjects within its jurisdiction and on which it was disposed to act;[17] (b) to recognize that such inquiries may be conducted through committees; (c) to subject defaulting and contumacious witnesses to indictment and punishment in the courts, and thereby to enable either house to exert the power of inquiry " more effectually ";[18] and (d) to open the way for obtaining evidence in such an inquiry, which otherwise could not be obtained, by exempting witnesses required to give evidence therein from criminal and penal prosecutions in respect of matters disclosed by their evidence.

Four decisions of this Court are cited and more or less relied on, and we now turn to them.

The first decision was in *Anderson* v. *Dunn,* 6 Wheat. 204.  The question there was whether, under the Constitution, the House of Representatives has power to attach and punish a person other than a member for con-

---

[17] In construing section 1 of the Act of 1857 as reproduced in section 102 of the Revised Statutes, this Court said in *In re Chapman,* 166 U. S. 661, 667:

" It is true that the reference is to ' any ' matter under inquiry, and so on, and it is suggested that this is fatally defective because too broad and unlimited in its extent; but nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion, *Lau Ow Bew* v. *United States,* 144 U. S. 47, 59; and we think that the word ' any,' as used in these sections, refers to matters within the jurisdiction of the two Houses of Congress, before them for consideration and proper for their action; to questions pertinent thereto; and to facts or papers bearing thereon."

[18] This Court has said of the act of 1857 that " it was necessary and proper for carrying into execution the powers vested in Congress and in each house thereof." *In re Chapman,* 166 U. S. 661, 671.

tempt of its authority—in fact, an attempt to bribe one of its members. The Court regarded the power as essential to the effective exertion of other powers expressly granted, and therefore as implied. The argument advanced to the contrary was that as the Constitution expressly grants to each house power to punish or expel its own members and says nothing about punishing others, the implication or inference, if any, is that power to punish one who is not a member is neither given nor intended. The Court answered this by saying:

(p. 225) "There is not in the whole of that admirable instrument, a grant of powers which does not draw after it others, not expressed, but vital to their exercise; not substantive and independent, indeed, but auxiliary and subordinate."

(p. 233) "This argument proves too much; for its direct application would lead to annihilation of almost every power of Congress. To enforce its laws upon any subject without the sanction of punishment is obviously impossible. Yet there is an express grant of power to punish in one class of cases and one only, and all the punishing power exercised by Congress in any cases, except those which relate to piracy and offenses against the laws of nations, is derived from implication. Nor did the idea ever occur to any one, that the express grant in one class of cases repelled the assumption of the punishing power in any other. The truth is, that the exercise of the powers given over their own members, was of such a delicate nature, that a constitutional provision became necessary to assert or communicate it. Constituted, as that body is, of the delegates of confederated States, some such provision was necessary to guard against their mutual jealousy, since every proceeding against a representative would indirectly affect the honour or interests of the state which sent him."

The next decision was in *Kilbourn* v. *Thompson,* 103 U. S. 168. The question there was whether the House of Representatives had exceeded its power in directing one of its committees to make a particular investigation. The decision was that it had. The principles announced and applied in the case are—that neither house of Congress possesses a " general power of making inquiry into the private affairs of the citizen "; that the power actually possessed is limited to inquiries relating to matters of which the particular house " has jurisdiction " and in respect of which it rightfully may take other action; that if the inquiry relates to " a matter wherein relief or redress could be had only by a judicial proceeding " it is not within the range of this power, but must be left to the courts, conformably to the constitutional separation of governmental powers; and that for the purpose of determining the essential character of the inquiry recourse may be had to the resolution or order under which it is made. The court examined the resolution which was the basis of the particular inquiry, and ascertained therefrom that the inquiry related to a private real-estate pool or partnership in the District of Columbia. Jay Cooke & Co. had had an interest in the pool, but had become bankrupts, and their estate was in course of administration in a federal bankruptcy court in Pennsylvania. The United States was one of their creditors. The trustee in the bankruptcy proceeding had effected a settlement of the bankrupts' interest in the pool, and of course his action was subject to examination and approval or disapproval by the bankruptcy court. Some of the creditors, including the United States, were dissatisfied with the settlement. In these circumstances, disclosed in the preamble, the resolution directed the committee " to inquire into the matter and history of said real-estate pool and the character of said settlement, with the amount of property involved in which Jay Cooke & Co.

were interested, and the amount paid or to be paid in
said settlement, with power to send for persons and
papers and report to the House." The Court pointed
out that the resolution contained no suggestion of contem-
plated legislation; that the matter was one in respect to
which no valid legislation could be had; that the
bankrupts' estate and the trustee's settlement were
still pending in the bankruptcy court; and that the
United States and other creditors were free to press their
claims in that proceeding. And on these grounds the
Court held that in undertaking the investigation " the
House of Representatives not only exceeded the limit of
its own authority, but assumed power which could only
be properly exercised by another branch of the govern-
ment, because it was in its nature clearly judicial."

The case has been cited at times, and is cited to us now,
as strongly intimating, if not holding, that neither house
of Congress has power to make inquiries and exact evi-
dence in aid of contemplated legislation. There are ex-
pressions in the opinion which, separately considered,
might bear such an interpretation; but that this was not
intended is shown by the immediately succeeding state-
ment (p. 189) that " This latter proposition is one which
we do not propose to decide in the present case because
we are able to decide the case without passing upon the
existence or non-existence of such a power in aid of the
legislative function."

Next in order is *In re Chapman*, 166 U. S. 661. The
inquiry there in question was conducted under a resolu-
tion of the Senate and related to charges, published in the
press, that senators were yielding to corrupt influences in
considering a tariff bill then before the Senate and were
speculating in stocks the value of which would be affected
by pending amendments to the bill. Chapman appeared
before the committee in response to a subpoena, but re-
fused to answer questions pertinent to the inquiry, and

was indicted and convicted under the act of 1857 for his refusal. The Court sustained the constitutional validity of the act of 1857, and, after referring to the constitutional provision empowering either house to punish its members for disorderly behavior and by a vote of two-thirds to expel a member, held that the inquiry related to the integrity and fidelity of senators in the discharge of their duties, and therefore to a matter " within the range of the constitutional powers of the Senate " and in respect of which it could compel witnesses to appear and testify. In overruling an objection that the inquiry was without any defined or admissible purpose, in that the preamble and resolution made no reference to any contemplated expulsion, censure, or other action by the Senate, the Court held that they adequately disclosed a subject-matter of which the Senate had jurisdiction, that it was not essential that the Senate declare in advance what it meditated doing, and that the assumption could not be indulged that the Senate was making the inquiry without a legitimate object.

The case is relied on here as fully sustaining the power of either house to conduct investigations and exact testimony from witnesses for legislative purposes. In the course of the opinion (p. 671) it is said that disclosures by witnesses may be compelled constitutionally " to enable the respective bodies to discharge their legitimate functions, and that it was to effect this that the act of 1857 was passed "; and also " We grant that Congress could not divest itself, or either of its houses, of the essential and inherent power to punish for contempt, in cases to which the power of either house properly extended; but, because Congress, by the act of 1857, sought to aid each of the houses in the discharge of its constitutional functions, it does not follow that any delegation of the power in each to punish for contempt was involved." The terms " legitimate functions " and " constitutional functions "

are broad and might well be regarded as including the legislative function, but as the case in hand did not call for any expression respecting that function, it hardly can be said that these terms were purposely used as including it.

The latest case is *Marshall* v. *Gordon,* 243 U. S. 521. The question there was whether the House of Representatives exceeded its power in punishing, as for a contempt of its authority, a person—not a member—who had written, published and sent to the chairman of one of its committees an ill-tempered and irritating letter respecting the action and purposes of the committee. Power to make inquiries and obtain evidence by compulsory process was not involved. The Court recognized distinctly that the House of Representatives has implied power to punish a person not a member for contempt, as was ruled in *Anderson* v. *Dunn, supra,* but held that its action in this instance was without constitutional justification. The decision was put on the ground that the letter, while offensive and vexatious, was not calculated or likely to affect the House in any of its proceedings or in the exercise of any of its functions—in short, that the act which was punished as a contempt was not of such a character as to bring it within the rule that an express power draws after it others which are necessary and appropriate to give effect to it.

While these cases are not decisive of the question we are considering, they definitely settle two propositions which we recognize as entirely sound and having a bearing on its solution: One, that the two houses of Congress, in their separate relations, possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective; and, the other, that neither house is invested with " general " power to inquire into private affairs and compel disclo-

sures, but only with such limited power of inquiry as is
shown to exist when the rule of constitutional interpreta-
tion just stated is rightly applied.   The latter proposition
has further support in *Harriman* v. *Interstate Commerce
Commission*, 211 U. S. 407, 417–419, and *Federal Trade
Commission* v. *American Tobacco Company*, 264 U. S.
298, 305–306.

With this review of the legislative practice, congres-
sional enactments and court decisions, we proceed to a
statement of our conclusions on the question.

We are of opinion that the power of inquiry—with
process to enforce it—is an essential and appropriate
auxiliary to the legislative function.   It was so regarded
and employed in American legislatures before the Con-
stitution was framed and ratified.   Both houses of Con-
gress took this view of it early in their history—the House
of Representatives with the approving votes of Mr. Madi-
son and other members whose service in the convention
which framed the Constitution gives special significance
to their action—and both houses have employed the
power accordingly up to the present time.   The acts of
1798 and 1857, judged by their comprehensive terms,
were intended to recognize the existence of this power in
both houses and to enable them to employ it "more
effectually" than before.   So, when their practice in the
matter is appraised according to the circumstances in
which it was begun and to those in which it has been
continued, it falls nothing short of a practical construc-
tion, long continued, of the constitutional provisions
respecting their powers, and therefore should be taken
as fixing the meaning of those provisions, if otherwise
doubtful.[19]

---

[19] *Stuart* v. *Laird*, 1 Cranch 299, 309; *Martin* v. *Hunter's Lessee*, 1
Wheat. 304, 351; *Ames* v. *Kansas*, 111 U. S. 449, 469; *Knowlton* v.
*Moore*, 178 U. S. 41, 56, 92; *Fairbank* v. *United States*, 181 U. S.
283, 306, *et seq.*

We are further of opinion that the provisions are not of doubtful meaning, but, as was held by this Court in the cases we have reviewed, are intended to be effectively exercised, and therefore to carry with them such auxiliary powers as are necessary and appropriate to that end. While the power to exact information in aid of the legislative function was not involved in those cases, the rule of interpretation applied there is applicable here. A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and adopted. In that period the power of inquiry —with enforcing process—was regarded and employed as a necessary and appropriate attribute of the power to legislate—indeed, was treated as inhering in it. Thus there is ample warrant for thinking, as we do, that the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised.

The contention is earnestly made on behalf of the witness that this power of inquiry, if sustained, may be abusively and oppressively exerted. If this be so, it affords no ground for denying the power. The same contention might be directed against the power to legislate, and of course would be unavailing. We must assume, for present purposes, that neither house will be disposed to exert the power beyond its proper bounds, or with-

out due regard to the rights of witnesses. But if, contrary to this assumption, controlling limitations or restrictions are disregarded, the decisions in *Kilbourn* v. *Thompson* and *Marshall* v. *Gordon* point to admissible measures of relief. And it is a necessary deduction from the decisions in *Kilbourn* v. *Thompson* and *In re Chapman* that a witness rightfully may refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry.

We come now to the question whether it sufficiently appears that the purpose for which the witness's testimony was sought was to obtain information in aid of the legislative function. The court below answered the question in the negative and put its decision largely on this ground, as is shown by the following excerpts from its opinion (299 Fed. 638, 639, 640):

" It will be noted that in the second resolution the Senate has expressly avowed that the investigation is in aid of other action than legislation. Its purpose is to ' obtain information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper.' This indicates that the Senate is contemplating the taking of action other than legislative, as the outcome of the investigation, at least the possibility of so doing. The extreme personal cast of the original resolutions; the spirit of hostility towards the then Attorney General which they breathe; that it was not avowed that legislative action was had in view until after the action of the Senate had been challenged; and that the avowal then was coupled with an avowal that other action was had in view—are calculated to create the impression that the idea of legislative action being in contemplation was an afterthought.

" That the Senate has in contemplation the possibility of taking action other than legislation as an outcome of the investigation, as thus expressly avowed, would seem

of itself to invalidate the entire proceeding. But, whether so or not, the Senate's action is invalid and absolutely void, in that, in ordering and conducting the investigation, it is exercising the judicial function, and power to exercise that function, in such a case as we have here, has not been conferred upon it expressly or by fair implication. What it is proposing to do is to determine the guilt of the Attorney General of the shortcomings and wrongdoings set forth in the resolutions. It is ' to hear, adjudge, and condemn.' In so doing it is exercising the judicial function.

"What the Senate is engaged in doing is not investigating the Attorney General's office; it is investigating the former Attorney General. What it has done is to put him on trial before it. In so doing it is exercising the judicial function. This it has no power to do."

We are of opinion that the court's ruling on this question was wrong, and that it sufficiently appears, when the proceedings are rightly interpreted, that the object of the investigation and of the effort to secure the witness's testimony was to obtain information for legislative purposes.

It is quite true that the resolution directing the investigation does not in terms avow that it is intended to be in aid of legislation; but it does show that the subject to be investigated was the administration of the Department of Justice—whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers—specific instances of alleged neglect being recited. Plainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit.

42847°—27——12

This becomes manifest when it is reflected that the functions of the Department of Justice, the powers and duties of the Attorney General and the duties of his assistants, are all subject to regulation by congressional legislation, and that the department is maintained and its activities are carried on under such appropriations as in the judgment of Congress are needed from year to year.

The only legitimate object the Senate could have in ordering the investigation was to aid it in legislating; and we think the subject-matter was such that the presumption should be indulged that this was the real object. An express avowal of the object would have been better; but in view of the particular subject-matter was not indispensable. In the *Chapman* case, where the resolution contained no avowal, this Court pointed out that it plainly related to a subject-matter of which the Senate had jurisdiction, and said "We cannot assume on this record that the action of the Senate was without a legitimate object"; and also that "it was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded." (166 U. S. 669–670.) In *People* v. *Keeler*, 99 N. Y. 463, where the Court of Appeals of New York sustained an investigation ordered by the Senate of that state where the resolution contained no avowal, but disclosed that it definitely related to the administration of a public office the duties of which were subject to legislative regulation, the court said (pp. 485, 487): "Where public institutions under the control of the State are ordered to be investigated it is generally with the view of some legislative action respecting them, and the same may be said in respect of public officers." And again: "We are bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed, and we have no right to assume that the contrary was intended."

While we rest our conclusion respecting the object of the investigation on the grounds just stated, it is well to observe that this view of what was intended is not new, but was shown in the debate on the resolution.[20]

Of course, our concern is with the substance of the resolution and not with any nice questions of propriety respecting its direct reference to the then Attorney General by name. The resolution, like the charges which prompted its adoption, related to the activities of the department while he was its supervising officer; and the reference to him by name served to designate the period to which the investigation was directed.

We think the resolution and proceedings give no warrant for thinking the Senate was attempting or intending to try the Attorney General at its bar or before its committee for any crime or wrongdoing. Nor do we think

---

[20] Senator George said: "It is not a trial now that is proposed, and there has been no trial proposed save the civil and criminal actions to be instituted and prosecuted by counsel employed under the resolution giving to the President the power to employ counsel. We are not to try the Attorney General. He is not to go upon trial. Shall we say the legislative branch of the Government shall stickle and halt and hesitate because a man's public reputation, his public character, may suffer because of that legislative action? Has not the Senate power to appoint a committee to investigate any department of the Government, any department supported by the Senate in part by appropriations made by the Congress? If the Senate has the right to investigate the department, is the Senate to hesitate, is the Senate to refuse to do its duty merely because the public character or the public reputation of some one who is investigated may be thereby smirched, to use the term that has been used so often in the debate? . . . It is sufficient for me to know that there are grounds upon which I may justly base my vote for the resolution; and I am willing to leave it to the agent created by the Senate to proceed with the investigation fearlessly upon principle, not for the purpose of trying but for the purpose of ascertaining facts which the Senate is entitled to have within its possession in order that it may properly function as a legislative body." Cong. Rec., 68th Cong., 1st Sess., pp. 3397, 3398.

it a valid objection to the investigation that it might possibly disclose crime or wrongdoing on his part.

The second resolution—the one directing that the witness be attached—declares that his testimony is sought with the purpose of obtaining "information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper." This avowal of contemplated legislation is in accord with what we think is the right interpretation of the earlier resolution directing the investigation. The suggested possibility of "other action" if deemed "necessary or proper" is of course open to criticism in that there is no other action in the matter which would be within the power of the Senate. But we do not assent to the view that this indefinite and untenable suggestion invalidates the entire proceeding. The right view in our opinion is that it takes nothing from the lawful object avowed in the same resolution and rightly inferable from the earlier one. It is not as if an inadmissible or unlawful object were affirmatively and definitely avowed.

We conclude that the investigation was ordered for a legitimate object; that the witness wrongfully refused to appear and testify before the committee and was lawfully attached; that the Senate is entitled to have him give testimony pertinent to the inquiry, either at its bar or before the committee; and that the district court erred in discharging him from custody under the attachment.

Another question has arisen which should be noticed. It is whether the case has become moot. The investigation was ordered and the committee appointed during the Sixty-eighth Congress. That Congress expired March 4, 1925. The resolution ordering the investigation in terms limited the committee's authority to the period of the Sixty-eighth Congress; but this apparently was changed by a later and amendatory resolution authorizing the committee to sit at such times and places as it might

deem advisable or necessary.[21]  It is said in Jefferson's Manual:[22] " Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose." But the context shows that the reference is to the two houses of Parliament when adjourned by prorogation or dissolution by the King. The rule may be the same with the House of Representatives whose members are all elected for the period of a single Congress; but it cannot well be the same with the Senate, which is a continuing body whose members are elected for a term of six years and so divided. into classes that the seats of one-third only become vacant at the end of each Congress, two-thirds always continuing into the next Congress, save as vacancies may occur through death or resignation.

Mr. Hinds in his collection of precedents says: " The Senate, as a continuing body, may continue its committees through the recess following the expiration of a Congress ";[23] and, after quoting the above statement from Jefferson's Manual, he says: " The Senate, however, being a continuing body, gives authority to its committees during the recess after the expiration of a Congress." [24]  So far as we are advised the select committee having this investigation in charge has neither made a final report nor been discharged; nor has it been continued by an affirmative order.  Apparently its activities have been suspended pending the decision of this case.  But, be this as it may, it is certain that the committee may be continued or revived now by motion to that effect, and, if continued or revived, will have all its original powers.[25]

---

[21] Cong. Rec., 68th Cong., 1st Sess., p. 4126.

[22] Senate Rules and Manual, 1925, p. 303.

[23] Vol. 4, sec. 4544.

[24] Vol. 4, sec 4545.

[25] Hinds' Precedents, Vol. 4, secs. 4396, 4400, 4404, 4405.

This being so, and the Senate being a continuing body, the case cannot be said to have become moot in the ordinary sense.   The situation is measurably like that in *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, 514–516, where it was held that a suit to enjoin the enforcement of an order of the Interstate Commerce Commission did not become moot through the expiration of the order where it was capable of repetition by the commission and was a matter of public interest.   Our judgment may yet be carried into effect and the investigation proceeded with from the point at which it apparently was interrupted by reason of the *habeas corpus* proceedings.   In these circumstances we think a judgment should be rendered as was done in the case cited.

What has been said requires that the final order in the district court discharging the witness from custody be reversed.

*Final order reversed.*

Mr. Justice Stone did not participate in the consideration or decision of the case.