UNITED STATES ex rel. CUNNINGHAM v. BARRY, Sergeant at Arms of United States Senate, et al. *

Circuit Court of Appeals, Third Circuit. November 26, 1928.

No. 3856.

Woolley, Circuit Judge, dissenting.

J. Elwood Dukes, Otto Kraus, Jr., Benjamin M. Golder, and Ruby R. Vale, all of Philadelphia, Pa., for appellant.

Howard Benton Lewis, of Philadelphia, Pa. (George W. Wickersham, of New York City, of counsel), for appellees.

Before. BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. On May 16, 1926, the Senate of the United States, by Resolution 195, created a committee and provided: "Said committee is hereby authorized and instructed immediately to investigate what moneys, emoluments, rewards or things of value, including agreements or understandings of support for appointment or election to office have been promised, contributed, made or expended, or shall hereafter be promised, contributed, expended or made by any person, firm, corporation, or committee, organization or association, to influence the nomination of any person as a candidate of any political party or organization for membership in the United States Senate, or to contribute to or promote the election of any person as a member of the United States Senate at the general election to be held in November, 1926. Said committee shall report the names of the persons, firms, or corporations, or committees, organizations, or associations that have made or shall hereafter make such promises, subscriptions, advancements, or payments and the amount by them severally contributed or promised as aforesaid, including the method of expenditure of said sums or the method of performance of said agreements, together with all facts in relation thereto."

The resolution further provided: "Every person who, having been summoned as witness by authority of said committee, * * * who having appeared refuses to answer any question pertinent to the investigation heretofore authorized, shall be held to the penalties provided by section 102 of the Revised Statutes of the United States." Such section provided: "Every person who having been summoned as a witness by the authority of either house of Congress, to give testimony or to produce papers upon any matter under inquiry before either house, or any committee of either house of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars nor less than one hundred dollars, and imprisonment in a common jail for not less than one month nor more than twelve months." 2 USCA § 192.

In response to a subpœna, Thomas W. Cunningham appeared before the committee, was sworn, and testified as follows:

"Q. With what political organization were you connected during the recent primary in Pennsylvania—the last primary? A. The Republican organization of Philadelphia county.

"Q. Who was the chairman of that organization? A. Thomas F. Watson.

"Q. And what candidate for the Senate was that organization supporting? A. Congressman Vare—W. S. Vare.

"Q. Did you collect any money for use in that campaign? A. I did not.

"Q. Was any money given to you for use in that campaign? A. Not one cent.

"Q. I mean to include in money, of

course—checks or drafts or anything— A. No checks, no drafts, or anything.

"Q. That you got money on? A. No, sir.

"Q. Did you handle any money in that campaign? A. I did not.

"Q. Did you deliver any money to any person? A. I did.

"Q. That is handling money, Mr. Cunningham. A. I did not catch your way of saying that.

"Q. Very well. To whom did you give any money? A. I handed money to Thomas F. Watson, $25,000, on the 10th day of April, 1926.

"Q. Where did you get that money? A. I got that money out of my own private funds.

"Q. Your own private moneys? A. Yes, sir; my own money; my own money.

"Q. How long had it been your own money?"

At this point the attorney of Cunningham, who had previously been directed by the chairman that "it would be entirely proper for you to address yourself to the chair and state your objection, the same as you would to a court," made objection, which, as pertinent to the question here involved, was: "I have further advised Mr. Cunningham that he need not disclose to this committee from what part of his personal fortune he paid the money to Mr. Watson that he did pay during this last campaign in Pennsylvania." The examination then proceeded:

"Q. How long had it been your own money? A. I refuse to answer that question, Senator, as a personal question. It is my own private business.

"Q. Where did you get this $25,000 you say you gave to Mr. Watson? A. I refuse to answer that question. I think that is personal.

"Q. Where were you keeping this $25,000 before you gave it to Mr. Watson? A. That is another personal question, Senator. I refuse to answer it.

"Q. Did you give this money to Mr. Watson in cash or by check? A. I gave it to him as cash.

"Q. Where were you when you gave it to him? A. I took it down to his headquarters at the Walton Hotel on the 10th day of April.

"Q. Did you have it in your pocket when you gave it to him—before you gave it to him? A. Yes, sir.

"Q. Where did you get it from to put in your pocket? A. That is a personal question, and I decline to answer it.

"Q. How long had you had this money in your possession? A. That is another personal question, and I decline to answer it. It was my own money, and I do not think I should tell the public where I kept it and how I got, or anything else about it.

"Q. How long have you been clerk of the quarter sessions court? A. Twenty-one years the 1st of January, 1926.

"Q. What is the salary of that position? A. $8,000 a year.

"Q. Was this money which you refer to as the $25,000 that you gave to Mr. Watson savings from your salary? A. That is another personal question. I cannot answer that.

"Q. Unfortunately, a good many questions are personal. A. Yes; I think a man's own money is one of his own personal privileges, and he is not supposed to tell how he got it or how he saved it. I think that is a rather unfair question to ask me; how I got the money, how I saved it, and what I done with it.

"Q. I dare say. Is there anything wrong, or wicked, or crooked about the way you got this money, so that it will embarrass you to answer the question or will subject you to criminal prosecution?

"Mr. Golder: I think that is an unfair question, Senator, and I advise Mr. Cunningham to disregard it.

"Q. If you were to answer the questions I have asked you with regard to the sources from which and the way in which this money came to you, would it tend to subject you to criminal prosecution or public contempt or obloquy?

"Mr. Golder: Senator Reed, I thing that question is objectionable in form and the way in which it is put, and I advise Mr. Cunningham not to consider it, or not to answer it.

"Q. Do you refuse to answer, Mr. Cunningham? A. Yes, I refuse to answer. * * *

"Q. Did you give any other money than the $25,000 to anybody during this campaign? A. Yes; on the 13th of April I gave Mr. Watson $25,000 more.

"Q. So that you gave Mr. Watson a total of $50,000? A. $50,000, of my own money.

"Q. Where did you get the second $25,000 from? A. I refuse to answer that question, Senator.

"Q. You refuse to tell the committee anything about where you received this money from? A. Yes; I do.

"Q. The sources from which the money was received? A. Yes.

"Q. How long had the money been in

your possession? You refuse to tell that to the committee? A. I certainly do, because I think that is a personal, private question.

"Q. How long had you been saving up or accumulating this $50,000? A. I do not like to object to your questions, Senator, because I thing a man's own money—why I don't want to make it public to the press, to the newspapers in Philadelphia, about my private affairs, how I got this money or how I saved it.

"Q. Have you inherited any considerable sums of money? A. Never inherited a dollar in my life.

"Q. Have you been speculating in stocks or bonds or upon the board, so that you accumulated the money in that way?

"Mr. Golder: I object to that question and advise Mr. Cunningham that he need not answer.

"Q. What does the witness say? A. I refuse to answer.

"Q. Have you turned in on your tax returns any $50,000 for taxation purposes?

"Mr. Golder: I object to that question, Senator, and advise the witness that he need not answer.

"A. I refuse to answer.

"Q. Have you paid to the state of Pennsylvania, the county in which you live, or the city in which you live, any taxes upon this $50,000?

"Mr. Golder: I object to that question, Senator, and advise the witness that he need not answer. As a matter of fact, there is no taxation in Pennsylvania on any such amount.

"A. I refuse to answer, Senator.

"Q. Have you returned to the federal government this $50,000 in any form?

"Mr. Golder: I object to that question, Senator, and advise the witness he need not answer.

"A. I refuse to answer.

"Q. Did you collect any money from persons employed either by the city of Philadelphia or by the state of Pennsylvania? A. Not one dollar.

"Q. Were any moneys paid to you by any of these persons I have just referred to? A. No, sir.

"Q. Do you know of any collection of money from state employees for political purposes? A. I do not, Senator. * * *

"Q. How long have you known Congressman Vare? A. Ever since I have been a boy —35 or 40 years, I guess.

"Q. Were you in any way connected with his campaign committee, the committee which was conducting his campaign, in the last primary? A. Only in one way; I was for him after he concluded to be a candidate for United States Senator.

"Q. Did you ever talk with him? A. I talked with him on several occasions about it.

"Q. With him during the campaign? A. No, sir. This was prior to the campaign, before he came out as a candidate.

"Q. Did you urge him to come out? A. No; I rather urged him the other way, Senator.

"Q. When he did come out, you became one of his supporters? A. Because our organization, as a rule—if the majority make up their mind to be a candidate—the majority made up their minds for William S. Vare, and I went along with the majority.

"Q. When you speak of 'our organization,' what organization do you mean? A. The Republican city committee of Philadelphia. We have 48 wards; 48 members of that committee.

"Q. Are you a member? A. A member of that committee; yes, sir.

"Q. For which ward? A. The Tenth ward.

"Q. During the campaign, then, after the organization resolved to support Vare, you gave him your loyal support? A. Yes, sir.

"Q. Who asked you to make this contribution of $50,000? A. Nobody asked me, Senator. I will tell you the reason why I made this contribution. I was a Penrose man to the day he died, in Philadelphia. Eddie Beidleman and Harry Baker have been the same as my two sons, and were very close friends of Penrose's to the day of his death. Beidleman's ambition was to be Governor. I was for Beidleman four years ago. George Alter was picked, and he had to step aside. This time I thought that he would make the best Governor Pennsylvania ever had. I thought he was the most practical man in the state of Pennsylvania, a man who was a member of the Legislature, state senator for four years, Lieutenant Governor four years, and a real man, and I thought he would make the best Governor Pennsylvania ever had, and I was very fond of him. Now that was my whole interest.

"Q. Had you ever made any such contribution as this before out of your own money? A. Never before in my life. I had made small contributions, a hundred or five hundred dollars at different times, to help some poor fellow running for council."

Thereupon the chairman cautioned the witness of the consequences of his refusal to answer, and the witness replied as follows:

"The Chairman: Mr. Cunningham, I

want to be perfectly frank with you. It will be the duty of the committee to report you to the United States Senate for contempt. That is not a threat; we are not making threats. That is the fact. Then, of course, it will have to be determined whether you have to answer these questions. What the result may be will have to be determined by the Senate, and possibly by the courts. I think it is only fair to make that statement to you, and, having made it, I ask you if you adhere to the position you have taken in your various refusals to answer?

"Mr. Cunningham: I do, Senator."

On February 21, 1927, Cunningham again appeared before the committee, his testimony as above was read to him, and he again declined to answer in the following colloquy:

"Q. We have called you here for the purpose of giving you an opportunity to purge yourself of what was regarded as contempt of the committee and of the Senate. Do you still stand upon your refusal to answer the questions which were asked you on the previous hearing? A. I do, sir.

"Q. You have nothing to say further as to your reasons for refusing to answer than you stated before? A. I have not.

"Q. Mr. Cunningham, I think you will have to agree that at least the committee has given you every opportunity to make an explanation. If you do not desire to make it, of course, you have the right. A. The only thing I was interested in, as I told you before, Senator, was Beidleman, and not any other project. If he had not been on the ticket, I would not have given it.

"Q. Do you know whether it was reported in Mr. Beidleman's campaign expenses? A. I really do not know that. I instructed Mr. Watson what my thought was about it, because he had been a friend of mine for 40-odd years, and that was my only interest in it."

Subsequently the committee reported to the Senate as follows:

"The witness Cunningham refused to amplify his testimony in any particular, stood on his previous refusals to answer the interrogatories propounded to him, and defied the jurisdiction of your committee. Your committee therefore reports the defiant and contumacious conduct of the said witness Thomas W. Cunningham, and recommends that he be adjudged in contempt of your committee and of the Senate of the United States."

And thereafter by Resolution 179 the Senate, reciting that Cunningham had twice appeared before the committee and "declined to answer certain questions relevant and pertinent to the matters then under inquiry, resolved:

"That the President of the Senate issue his warrant commanding the sergeant at arms or his deputy to take into custody the body of said Thomas W. Cunningham, wherever found, and to bring the said Thomas W. Cunningham before the bar of the Senate, then and there, or elsewhere as it may direct, to answer such questions pertinent to the matter under inquiry as the Senate, through its said committee, or the President of the Senate, may propound, and to keep the said Thomas W. Cunningham in custody to await further order of the Senate."

Thereafter the presiding officer of the Senate signed a warrant of arrest which ordered the sergeant at arms of the Senate to "forthwith arrest and take into custody and bring to the bar of the Senate Thomas W. Cunningham", who, on being arrested, sued out a writ of habeas corpus to the court below, praying his discharge. This the court refused to do, whereupon Cunningham took this appeal.

An examination of the proceedings shows that this is not the case of a person who refused to obey a subpœna to appear before the Senate, as was the fact in McGrain v. Daugherty, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1, but of a witness who has duly twice appeared before a committee of the Senate and submitted himself to examination, but has rightfully or wrongfully declined to answer certain questions then asked. The record shows that such refusal to answer certain specific questions was the sole ground of the Senate's action, and therefore the sole ground of Cunningham's arrest. To contend the warrant of arrest was a subpœna to appear and testify, and not an arrest for contempt after he had duly appeared is to ignore the real situation. If the warrant of arrest is not based on the witness' alleged contempt in refusing to answer the questions propounded by the committee, it has no ground justifying its issue, for he did duly appear. And if it is regarded as an arrest to procure Cunningham's attendance as a witness, a subpœna served on him and neglect on his part to appear constitute the prerequisite preliminaries before an attachment for nonattendance issues.

No case or proceeding has come to our attention, either through counsel or independent research, in which either branch of the Congress has exercised the power of attachment without the prerequisite opportunity given to a witness to appear in response

to a subpœna—a course which, in our judgment, the case of McGrain v. Daugherty, supra, assumes should be followed, and where it is said: "The warrant was issued as an auxiliary process to compel him [the nonattending and duly subpœnaed witness] to give the testimony sought by the subpœna."

Turning, then, to the underlying question, was Cunningham in contempt in declining to answer the questions asked? The answer to that is: Were such questions relevant to the inquiry the committee was authorized to make? That inquiry, so far as here pertinent, was "to investigate what moneys * * * have been * * * contributed * * * by any person * * * to influence the nomination of any person as a candidate * * * for membership in the United States Senate, or to contribute to or promote the election of any person as a member of the United States Senate at the general election to be held in November, 1926." Such being the items of inquiry, the resolution provided for a report thereof to the Senate by the committee of such items, viz., "said committee shall report the names of the persons * * * that have made such * * * payments and the amounts by them severally contributed * * * including the methods of expenditure of said sums * * * together with all facts in relation thereto." And that the matters so specified constituted the scope of the committee's inquiry was evidenced by the resolution providing for imposing the penalties of Revised Statute, § 102, upon a witness who "having appeared refuses to answer any question pertinent to the investigation heretofore authorized."

Turning to the inquiry heretofore specified as authorized, we note that Cunningham, as bearing on "what moneys * * * have been contributed," testified he had contributed $50,000. As bearing on the question whether such money was contributed "to influence the nomination of any person as a candidate for membership in the United States Senate," he testified that he paid the money to Thomas F. Watson, treasurer of a political organization which was supporting Vare for nomination for United States Senator and Beidleman for Governor; that, while he favored and supported Vare as a candidate, his whole object in giving the money was to assist Beidleman, and if Beidleman "had not been on the ticket I would not have given it." Touching the subject of investigation described as "including the method of expenditure of said sums,"

Cunningham testified he did not know whether his contribution had been reported in Beidleman's campaign expenses, adding, "I instructed Mr. Watson what my thought was about it." It will thus be seen that Cunningham answered the questions asked him on the subjects specified in the resolution, and that his answers enabled the committee, so far as the inquiry concerned him, to fulfill the specified duties of their appointment, viz., to "report the names of the persons * * * that have made * * * payments and the amount by them severally contributed * * * including the method of expenditure of said sums." Such being the case, we do not see that proof of how Cunningham came by the money he says he thus personally contributed could affect the objects of investigation referred to by the Senate to the committee.

Suggestions were made by one side at the argument that, if the witness answered it might throw light on the subject of investigation, and by the other side that while the witness' answer might throw no such light, a statement by the witness might do him much harm. But a ruling on the admissibility of evidence is not made on surmises. It is based on the ground that the burden of showing the relevancy of any testimony which is objected to is on him who proposes to give it. As we have seen in the proofs the witness had answered, as pertinent to the investigation, that he did not "collect any money for use in that campaign," that no money was given to him for use in the campaign; that no one asked him to contribute the $50,000. There being nothing in the record to show the relevancy of the question, and no ground of relevancy being shown by counsel when interrogated at the argument, the case narrows down to whether the witness was in contempt in refusing to have his private affairs as to where he got this money made a matter of public investigation. The right of agencies of government to investigate cannot be denied or thwarted, but in statute and decision, we find the line it may not cross is the barrier provided by statute (R. S. § 102), which permits only questions "pertinent to the question under inquiry," and as to those without that limit as lately stated by the Supreme Court in McGrain v. Daugherty, supra, "a witness rightfully may refuse to answer where * * * the questions are not pertinent to the matter under inquiry."

After full consideration, we are of opinion no facts, reasons, or grounds have been shown or now appear which make pertinent

the inquiry into how Cunningham made the money which he admits he contributed. That a situation might arise where the facts would show such questions were pertinent goes without saying, but under the present situation and no such facts appearing, we hold Cunningham was justified in declining to answer the questions asked him, and that this warrant, whose only foundation is alleged contempt for refusal to so answer, has no support in law. Accordingly we hold the court below was in error, and the record will be remanded, with instructions to discharge the petitioner.

WOOLLEY, Circuit Judge (dissenting). I am constrained to dissent from the judgment of the court, first on its statement of the case, and next on the applicable law. I distinguish between the case as stated and the case made by the record, as I read it. The court has stated the case as though the Senate of the United States had in fact adjudged Cunningham, the relator, guilty of contempt for refusing to answer questions which its committee had theretofore propounded to him, and, standing on that predicate, it has entered into a discussion of the relevancy and validity of the questions asked and the relator's justification for refusing to answer them. As I read the record, there was no such adjudication for contempt. There was nothing more than a recommendation by a committee that the Senate adjudge him in contempt. On that recommendation the Senate did not act. In truth, the Senate has neither tried nor convicted Cunningham for contempt. Nor has it indicated a purpose to try him. All it did was to authorize the issuance of a warrant of arrest, which, as I read the record, is the real beginning of the controversy here on an appeal from an order of a district judge dismissing the petition for a writ of habeas corpus. The warrant of arrest is not a contempt process, original or execution. It is an exercise by the Senate of the United States of its power to call a person before it and interrogate him in regard to matters of legislation, or of determining "the election, returns and qualifications" of one claiming the right to sit as a member of that body.

The power of the Senate to "judge of the elections, returns, and qualifications of its own members" is expressly conferred by the Constitution (article 1, section 5), and the Supreme Court has said that "the two houses of Congress, in their separate relations, possess not only such powers as are expressly granted to them by the Constitu-

tion, but such auxiliary powers as are necessary and appropriate to make the express powers effective. * * * The power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." McGrain v. Daugherty, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1. Very recently, in Reed v. County Commissioners of Delaware County, Pennsylvania, 277 U. S. 376, 48 S. Ct. 531, 72 L. Ed. 924, the Supreme Court, speaking of the same subject, said that the Senate "is fully empowered, and may determine such matters without the aid of the House of Representatives or the Executive or Judicial Department. That power carries with it authority to take such steps as may be appropriate and necessary to secure information upon which to decide concerning elections. * * * By means of its own process or that of its committee, the Senate is empowered to obtain evidence relating to the matters committed to it by the Constitution." That, I think, is precisely what the Senate, conformably with precedent, did in this instance, being particular to embody in the resolution which authorized the warrant of arrest its purpose, which was not to punish the relator for past contumacy or to try him for contempt, but "to bring (him) before the bar of the Senate * * * to answer such questions pertinent to the matter under inquiry as the Senate, through its said committee, or the President of the Senate, may propound." Clearly the warrant of arrest in this case is a "process to enforce" the Senate's "power of inquiry." What questions the Senate may lawfully ask, when in response to the warrant the relator is produced before that body, surely this court should not anticipate or prejudge. Nor should it determine their propriety or validity from the possible impropriety, irrelevancy, or invalidity of questions previously asked.

Moreover, I am not persuaded to the contention advanced by the relator and adopted by the court that the warrant of arrest is in itself invalid. The power of the Senate to judge the elections, returns, and qualifications of its members is essentially judicial, and to make that power effective it also has power, like all other judicial tribunals, to compel attendance of witnesses by compulsory process. That compulsory process of a bench warrant or a warrant of arrest is dependent for its validity upon disobedience of a previously issued subpœna is not found in any federal or state statute (U. S. Code, title 28, § 659 [28 USCA § 659]; Massachusetts

General Laws 1921, c. 277, § 70; New York Code of Criminal Procedure, § 618b), or in any judicial decision that has come to my attention. The fact that resort to such process usually follows disobedience of a subpoena is merely an indication of its customary use, not of its invalidity when in a given exigency it is used otherwise.

Turning to .the general law, on which I base my dissent, I am constrained gravely to state and emphasize my conviction that the action (as distinguished from legislation) of the Senate of the Congress of the United States, a constituent body of an independent department of the government, is not subject to review and annulment by the judicial department. For a more particular statement of my views on the law, I refer and subscribe to the terse, yet entirely adequate, opinion which Judge Dickinson rendered when he dismissed the petition for a writ of habeas corpus.