# The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act

Under the Constitution, the President has plenary authority to represent the United States and to pursue its interests outside the borders of the country, subject only to limits contained in the Constitution itself and to such statutory limitations as the Constitution permits Congress to impose by exercising one of its enumerated powers.

The conduct of secret negotiations and intelligence operations lies at the very heart of the President's executive power. Statutory requirements that the President report to Congress about his activities in the realm of foreign policy must be construed consistently with his constitutional authority. A statute requiring the President to give Congress notice of covert operations "in a timely fashion" if he withholds prior notification should be construed to permit the President sufficient discretion to choose a reasonable moment for notifying Congress, including withholding notification at least until the secret diplomatic or covert undertaking has progressed to a point when disclosure will not threaten its success.

December 17, 1986

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum responds to your request that this Office review the legality of the President's decision to postpone notifying Congress of a recent series of actions that he took with respect to Iran. As we understand the facts, the President has, for the past several months, been pursuing a multifaceted secret diplomatic effort aimed at bringing about better relations between the United States and Iran (partly because of the general strategic importance of that country and partly to help end the Iran-Iraq war on terms favorable to our interests in the region); at obtaining intelligence about political conditions within Iran; and at encouraging Iranian steps that might facilitate the release of American hostages being held in Lebanon. It is our understanding that the President, in an effort to achieve these goals, instructed his staff to make secret contacts with elements of the Iranian government who favored closer relations with the United States; that limited quantities of defensive arms were provided to Iran; that these arms shipments were intended to increase the political influence of the Iranian elements who shared our interest in closer relations between the two countries and to demonstrate our good faith; and that there was hope that the limited arms shipments would encourage the Iranians to provide our government with useful intelligence about Iran and to assist our efforts to free the Americans being held captive in Lebanon.

159

On these facts, we conclude that the President was within his authority in maintaining the secrecy of this sensitive diplomatic initiative from Congress until such time as he believed that disclosure to Congress would not interfere with the success of the operation.

Section 501 of the National Security Act permits the President to withhold prior notification of covert operations from Congress, subject to the requirements that he inform congressional committees of the operations "in a timely fashion," and that he give a statement of reasons for not having provided prior notice. We now conclude that the vague phrase "in a timely fashion" should be construed to leave the President wide discretion to choose a reasonable moment for notifying Congress. This discretion, which is rooted at least as firmly in the President's constitutional authority and duties as in the terms of any statute, must be especially broad in the case of a delicate and ongoing operation whose chances for success could be diminished as much by disclosure while it was being conducted as by disclosure prior to its being undertaken. Thus, the statutory allowance for withholding prior notification supports an interpretation of the "timely fashion" language, consistent with the President's constitutional independence and authority in the field of foreign relations, to withhold information about a secret diplomatic undertaking until such a project has progressed to a point where its disclosure will not threaten its success.[1]

## I. The President's Inherent Constitutional Powers Authorize a Wide Range of Unilateral Covert Actions in the Field of Foreign Affairs

### A. The President Possesses Inherent and Plenary Constitutional Authority in the Field of International Relations

"The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1. This is the principal textual source for the President's wide and inherent discretion to act for the nation in foreign affairs.[2] The clause has long been held to confer on the President plenary authority to represent the United States and to pursue its interests outside the borders of the country, subject only to limits specifically set forth in the Constitution itself

---

[1] The vagueness of the phrase "in a timely fashion," together with the relatively amorphous nature of the President's inherent authority in the field of foreign relations, necessarily leaves room for some dispute about the strength of the President's legal position in withholding information about the Iranian project from Congress over a period of several months. The remainder of this memorandum outlines the legal support for the President's position, and does not attempt to provide a comprehensive analysis of all the arguments and authorities on both sides of the question. This caveat, which does not alter the conclusion stated in the accompanying text, reflects the urgent time pressures under which this memorandum was prepared.

[2] The Constitution also makes the President Commander in Chief of the armed forces (Article II, § 2) and gives him power to make treaties and appoint ambassadors, subject to the advice and consent of the Senate (Article II, § 2), and to receive ambassadors and other public ministers (Article II, § 3). The Constitution also requires that the President "take Care that the Laws be faithfully executed" (Article II, § 3). These specific grants of authority supplement, and to some extent clarify, the discretion given to the President by the Executive Power Clause.

and to such statutory limitations as the Constitution permits Congress to impose by exercising one of its enumerated powers. The President's executive power includes, at a minimum, all the discretion traditionally available to any sovereign in its external relations, except insofar as the Constitution places that discretion in another branch of the government.

Before the Constitution was ratified, Alexander Hamilton explained in *The Federalist* why the President's executive power would include the conduct of foreign policy: "The essence of the legislative authority is to enact laws, or, in other words to prescribe rules for the regulation of the society; while the execution of the laws and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive magistrate."[3] This fundamental distinction between "prescribing rules for the regulation of the society" and "employing the common strength for the common defense" explains why the Constitution gave to Congress *only* those powers in the area of foreign affairs that directly involve the exercise of legal authority over American citizens.[4]

As to other matters in which the nation acts as a sovereign entity in relation to outsiders, the Constitution delegates the necessary authority to the President in the form of the "executive Power."[5]

---

[3] *The Federalist* No. 75, at 450 (A. Hamilton) (C. Rossiter ed. 1961). This number of *The Federalist* was devoted primarily to explaining why the power of making treaties is partly legislative and partly executive in nature, so that it made sense to require the cooperation of the President and the Senate in that special case.

[4] Congress' power "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," U.S. Const. art. I, § 8, cl 11, like the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," *id.* art. I, § 8, cl. 10, and the power "[t]o regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, reflects the fact that the United States is, because of its geographical position, necessarily a nation in which a significant number of citizens will engage in international commerce. A declaration of war immediately alters the legal climate for Americans engaged in foreign trade and is therefore properly treated as a legislative act necessarily binding on an important section of the private citizenry. Similarly, Congress' broad power over the establishment and maintenance of the armed forces, U.S. Const. art. I, § 8, cls 12–16, reflects their obviously important domestic effects. In accord with Hamilton's distinction, however, the actual command of the armed forces is given to the President in his role as Commander in Chief. Treaties (in whose making the Senate participates under Article II, § 2) have binding legal effect within our borders, and are most notable for the significantly *small* role that Congress plays.

[5] As one would expect in a situation dealing with implied constitutional powers, argument and authority can be mustered for the proposition that Congress was intended to have a significant share of the foreign policy powers not specifically delegated by the Constitution. Perhaps the most oft-cited authority for this position is James Madison's "Helvidius Letters" (*reprinted in part in* E. Corwin, *The President's Control of Foreign Relations* 16–27 (1917)), where he cautioned against construing the President's executive power so broadly as to reduce Congress' power to declare war to a mere formality. Madison's argument was directed principally at countering some overstatements made by Alexander Hamilton in his "Pacificus Letters" (*reprinted in part in* E. Corwin, *supra*, at 8–15). Madison's argument is *not* properly interpreted, however, to imply that Congress has as great a role to play in setting policy in foreign affairs as in domestic matters. Even Jefferson, who was generally disinclined to acknowledge implied powers in the federal government or in the President, wrote: "The transaction of business with foreign nations is executive altogether; it belongs, then, to the head of that department, except as to such portions of it as are specially submitted to the senate Exceptions are strictly to be construed. . ." 5 *Writings of Thomas Jefferson* 161 (Ford ed. 1895). While we agree that Congress has some powers to curb a President who persistently pursued a foreign policy that Congress felt was seriously undermining the national interest, especially in cases where Congress' constitutional authority to declare war was implicated, well-settled historical practice and legal precedents have confirmed the President's dominant role in formulating, as well as in carrying out, the nation's foreign policy.

The presumptively exclusive authority of the President in foreign affairs was asserted at the outset by George Washington and acknowledged by the First Congress. Without consulting Congress, President Washington determined that the United States would remain impartial in the war between France and Great Britain.[6] Similarly, the First Congress itself acknowledged the breadth of the executive power in foreign affairs when it established what is now the Department of State. In creating this executive department, Congress directed the department's head (i.e., the person now called the Secretary of State) to carry out certain specific tasks when entrusted to him by the President, as well as "such other matters respecting foreign affairs, as the President of the United States shall assign to the said department."[7] Just as the first President and the first Congress recognized that the executive function contained all the residual power to conduct foreign policy that was not otherwise delegated by the Constitution, subsequent historical practice has generally confirmed the President's primacy in formulating and carrying out American foreign policy.[8]

The Supreme Court, too, has recognized the President's broad discretion to act on his own initiative in the field of foreign affairs. In the leading case, *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), the Court drew a sharp distinction between the President's relatively limited inherent powers to act in the domestic sphere and his far-reaching discretion to act on his own authority in managing the external relations of the country. The Supreme Court emphatically declared that this discretion derives from the

---

[6] Proclamation of the President, Apr. 22, 1793, *reprinted in* 1 *Messages and Papers of the Presidents* 156–157 (J. Richardson ed. 1896). President Washington also warned that his Administration would pursue criminal prosecutions for violations of his neutrality proclamation. Although such prosecutions were upheld at the time, a rule that would prohibit such prosecutions was recognized by the Supreme Court relatively soon thereafter. *Compare Henfield's Case*, 11 F. Cas. 1099, 1102 (C.C.D. Pa. 1793) (No. 6,360) (Jay, C.J.), *with United States* v. *Hudson & Goodwin*, 11 U.S. (7 Cranch) 32 (1812). It is worth emphasizing that Presidents have sometimes encountered constitutional obstacles when attempting to pursue foreign policy goals through actions in the domestic arena, but have rarely been interfered with in taking diplomatic steps, or even military actions short of war, outside our borders. The present significance of President Washington's proclamation has less to do with the particular actions he might have taken in the domestic sphere than with his claim that *foreign* affairs are generally within the constitutional domain assigned to the Executive. This claim is consistent with the Constitution and has now been reinforced by long historical practice.

[7] Act of July 27, 1789, 1 Stat. 28–29. *See also* Act of Jan. 30, 1799, 1 Stat. 613 (similar provision currently codified at 18 U.S.C. § 953), which made it a crime for any person to attempt to influence the conduct of foreign nations with respect to a controversy with the United States.

[8] The fact that Presidents have often asked Congress to give them specific statutory authority to take action in foreign affairs may reflect a practical spirit of courtesy and compromise rather than any concession of an absence of inherent constitutional authority to proceed. For example, President Franklin Roosevelt requested that Congress repeal a provision of the Emergency Price Control Act that he felt was interfering with the war effort; he warned, however, that if Congress failed to act, he would proceed on the authority of his own office to take whatever measures were necessary to ensure the winning of the war. 88 Cong. Rec. 7044 (1942).

As one would expect, of course, Congress has not always accepted the most far-reaching assertions of Presidential authority. *See also Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) (Constitution did not authorize President to take possession of and operate privately owned steel mills that had ceased producing strategically important materials during labor dispute); *id* at 635 (Jackson, J., concurring) ("[The Constitution] enjoins upon [the government's] branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress.").

Constitution itself and that congressional efforts to act in this area must be evaluated in the light of the President's constitutional ascendancy:

> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority *plus* the very delicate, plenary and exclusive power of the President as the *sole* organ of the federal government in the field of international relations — *a power which does not require as a basis for its exercise an act of Congress*, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment — perhaps serious embarrassment — is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has *his* agents in the form of diplomatic, consular and other officials. *Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results.*[9]

Based on this analysis, the Supreme Court rejected the argument that Congress had improperly delegated a legislative function to the President when it authorized him to impose an embargo on arms going to an area of South America in

---

[9] 299 U.S. at 319–20 (emphasis added). *See also Chicago & Southern Air Lines* v. *Waterman S.S. Corp.,* 333 U.S. 103, 109 (1948) (President "possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs"); *id.* at 109–12 (refusing to read literally a statute that seemed to require judicial review of a presidential decision taken pursuant to his discretion to make foreign policy); *id.* at 111 ("It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.") (*quoted with approval in United States* v. *Nixon,* 418 U.S. 683, 710 (1974)).

In *Perez* v. *Brownell,* 356 U.S. 44, 57 (1958) (citations omitted), the Court stated, "Although there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of the Nation." The *Perez* Court, however, was reviewing the constitutionality of a statute in whose drafting the Executive Branch had played a role equivalent to one of Congress' own committees. 356 U.S. at 56. Furthermore, the statute at issue in *Perez* provided that an American national who voted in a political election of a foreign state would thereby lose his American nationality. If the President lacks the inherent constitutional authority to deprive an American of his nationality, then the *Perez* Court's language about congressional "regulation of foreign affairs" may refer only to "regulation of domestic affairs that affect foreign affairs." In any case, *Perez* should not be read to imply that Congress has broad legislative powers that can be used to diminish the President's inherent Article II discretion.

163

which a war was taking place. The Court's holding hinged on the essential insight that the embargo statute's principal effect was merely to remove any question about the President's power to pursue his foreign policy objectives by enforcing the embargo *within* the borders of this country.[10] As the Court emphatically stated, the President's authority to act in the field of international relations is plenary, exclusive, and subject to no legal limitations save those derived from applicable provisions of the Constitution itself.[11] As the Court noted with obvious approval, the Senate Committee on Foreign Relations acknowledged this principle at an early date in our history:

> "*The President is the constitutional representative of the United States with regard to foreign nations.* He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. *For his conduct he is responsible to the Constitution.* The committee consider this responsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety. The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch."

299 U.S. at 319 (emphasis added) (quoting U.S. Senate, Reports, Committee on Foreign Relations, vol. 8, p. 24 (Feb. 15, 1816)). It follows inexorably from the *Curtiss-Wright* analysis that congressional legislation authorizing extraterritorial diplomatic and intelligence activities is superfluous, and that statutes infringing the President's inherent Article II authority would be unconstitutional.[12]

---

[10] *See* 299 U.S. at 327 (effect of various embargo acts was to confide to the President "an authority which was cognate to the conduct by him of the foreign relations of the government") (quoting *Panama Refining Co. v. Ryan,* 293 U.S. 388, 422 (1935)). This implies that while the President may in some cases need enabling legislation in order to advance his foreign policy by controlling the activities of American citizens on American soil, he needs no such legislation for operations and negotiations outside our borders.

[11] Because the Presidential action at issue in *Curtiss-Wright* was authorized by statute, the Court's statements as to the President's inherent powers could be, and have been, characterized as *dicta. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 n.2 (1952) (Jackson, J., concurring). We believe, however, that the *Curtiss-Wright* Court's broad view of the President's inherent powers was essential to its conclusion that Congress had not unconstitutionally delegated legislative authority to the President. Furthermore, the Supreme Court has since reaffirmed its strong commitment to the principle requiring the "utmost deference" to Presidential responsibilities in the military and diplomatic areas. *United States v. Nixon,* 418 U.S. 683, 710 (1974).

[12] *See e.g., United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537 (1950) (citations omitted):
> The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

*Id.* at 542. *See also Worthy v. Herter,* 270 F.2d 905, 910–12 (D.C. Cir. 1959) (statute giving President authority to refuse to allow Americans to travel to foreign "trouble spots" simply reinforces the President's inherent constitutional authority to impose the same travel restrictions).

164

*B. Secret Diplomatic and Intelligence Missions Are at the Core of the President's Inherent Foreign Affairs Authority*

The President's authority over foreign policy, precisely because its nature requires that it be wide and relatively unconfined by preexisting constraints, is inevitably somewhat ill-defined at the margins. Whatever questions may arise at the outer reaches of his power, however, the conduct of secret negotiations and intelligence operations lies at the very heart of the President's executive power. The Supreme Court has repeatedly so held in modern times. For example:

> Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiations the Senate cannot intrude; and Congress itself is powerless to invade it.

*United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (emphasis in original). The Court has also, and more recently, emphasized that this core Presidential function is by no means limited to matters directly involving treaties. In *United States* v. *Nixon*, 418 U.S. 683 (1974), the Court invoked the basic *Curtiss-Wright* distinction between the domestic and international contexts to explain its rejection of President Nixon's claim of an absolute privilege of confidentiality for all communications between him and his advisors. While rejecting this sweeping and undifferentiated claim of executive privilege as applied to communications involving domestic affairs, the Court repeatedly and emphatically stressed that military or diplomatic secrets are in a different category: such secrets are intimately linked to the President's Article II duties, where the "courts have traditionally shown the *utmost deference* to Presidential responsibilities." 418 U.S. at 710 (emphasis added).[13]

Such statements by the Supreme Court reflect an understanding of the President's function that is firmly rooted in the nature of his office as it was understood at the time the Constitution was adopted. John Jay, for example, offered a concise statement in *The Federalist*:

> It seldom happens in the negotiation of treaties, of whatever nature, but that perfect *secrecy* and immediate *dispatch* are

---

[13] *See also id.* at 706 ("a claim of need to protect military, diplomatic, or sensitive national security secrets" would present a strong case for denying judicial power to make *in camera* inspections of confidential material); *id.* at 712 n.19 (recognizing "the President's interest in preserving state secrets").

Note also that the *Curtiss-Wright* Court expressly endorsed President Washington's refusal to provide the House of Representatives with information about treaty negotiations *after the negotiations had been concluded.* 299 U.S at 320–21. *A fortiori*, such information could be withheld *during* the negotiations.

sometimes requisite. There are cases where the most useful intelligence may be obtained, if the persons possessing it can be relieved from apprehensions of discovery. Those apprehensions will operate on those persons whether they are actuated by mercenary or friendly motives; and there doubtless are many of both descriptions who would rely on the secrecy of the President, but who would not confide in that of the Senate, and still less in that of a large popular assembly. The convention have done well, therefore, in so disposing of the power of making treaties that although the President must in forming them, act by the advice and consent of the Senate, yet he will be able to manage the business of intelligence in such manner as prudence may suggest.

\*     \*     \*

So often and so essentially have we heretofore suffered from the want of secrecy and dispatch that the Constitution would have been inexcusably defective if no attention had been paid to those objects. Those matters which in negotiations usually require the most secrecy and the most dispatch are those preparatory and auxiliary measures which are not otherwise important in a national view, than as they tend to facilitate the attainment of the objects of the negotiation.[14]

Jay's reference to treaties "of whatever nature" and his explicit discussion of intelligence operations make it clear that he was speaking, not of treaty negotiation in the narrow sense, but of the whole process of diplomacy and intelligence-gathering. The President's recent Iran project fits comfortably *within the terms of* Jay's discussion.

## C. The President Has Inherent Authority to Take Steps to Protect the Lives of Americans Abroad

Perhaps the most important reason for giving the federal government the attributes of sovereignty in the international arena was to protect the interests and welfare of American citizens from the various threats that may be posed by foreign powers. This obvious and common sense proposition was confirmed and relied on by the Supreme Court when it held that every citizen of the United States has a constitutional right, based on the Privileges or Immunities Clause of the Fourteenth Amendment, "to demand the care and protection of the Federal government over his life, liberty, and property when on the high seas or within the jurisdiction of a foreign government."[15] Accordingly, the Supreme

---

[14] *The Federalist* No. 64, at 392–93 (J. Jay) (C. Rossiter ed. 1961) (emphasis in original). Jay went on to note that "should any circumstance occur which requires the advice and consent of the Senate, he may at any time convene them." *Id.* at 393. Jay did not, however, suggest that the President would be obliged to seek such advice and consent for actions other than those specifically enumerated in the Constitution.

[15] *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 79 (1873).

Court has repeatedly intimated that the President has inherent authority to protect Americans and their property abroad by whatever means, short of war, he may find necessary.

An early judicial recognition of the President's authority to take decisive action to protect Americans abroad came during a mid-nineteenth century revolution in Nicaragua. On the orders of the President, the commander of a naval gunship bombarded a town where a revolutionary government had engaged in violence against American citizens and their property. In a later civil action against the naval commander for damages resulting from the bombardment, Justice Nelson of the Supreme Court held that the action could not be maintained:

> As the executive head of the nation, the president is made the only legitimate organ of the general government, to open and carry on correspondence or negotiations with foreign nations, in matters concerning the interests of the country or of its citizens. *It is to him, also, the citizens abroad must look for protection of person and of property*, and for the faithful execution of the laws existing and intended for their protection. For this purpose, the whole executive power of the country is placed in his hands, under the constitution, and the laws passed in pursuance thereof. . . .

> Now, as it respects the interposition of the executive abroad, for the protection of the lives or property of the citizen, *the duty must, of necessity, rest in the discretion of the president.* Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for; and the protection, to be effectual or of any avail, may, not infrequently, require the most prompt and decided action. Under our system of government, *the citizen abroad is as much entitled to protection as the citizen at home.* The great object and duty of government is the protection of the lives, liberty, and property of the people composing it, whether abroad or at home; and any government failing in the accomplishment of the object, or the performance of the duty, is not worth preserving.

*Durand* v. *Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4,186) (emphasis added).

Later, the full Court confirmed this analysis in an opinion holding that the President has inherent authority to provide bodyguards, clothed with federal immunity from state law, to protect judicial officers, even when they are travelling *within* the United States in the performance of their duties. *In re Neagle*, 135 U.S. 1 (1890). Rather than base its decision on a narrow analysis of the status of federal judges, the Court held that the Presidential duty to "take

Care that the Laws be faithfully executed"[16] includes "any obligation fairly and properly inferrible [sic] from" the Constitution.[17] The Court specifically stated that these were not limited to the express terms of statutes and treaties, but included "the rights, duties, and obligations growing out of *the Constitution itself*, our *international relations*, and *all* the protection implied by the nature of the government under the Constitution."[18] As the Court pointed out, Congress itself had approved this position when it ratified the conduct of the government in using military threats and diplomatic pressure to secure the release of an American who had been taken prisoner in Europe. Noting that Congress had voted a medal for the naval officer who had threatened to use force to obtain the American's release, the Court asked, "Upon what act of Congress then existing can any one lay his finger in support of the action of our government in this matter?"[19] If military force may be used on the President's own discretion to protect American lives and property abroad, surely the less drastic means employed by President Reagan during the Iran project were within his constitutional authority.

## II. Any Statute Infringing Upon the President's Inherent Authority to Conduct Foreign Policy Would be Unconstitutional and Void

Congress has traditionally exercised broad implied powers in overseeing the activities of Executive Branch agencies, including "probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Watkins v. United States*, 354 U.S. 178, 187 (1957); *see also McGrain v. Daugherty*, 273 U.S. 135, 161–164 (1927). This power of oversight is grounded on Congress' need for information to carry out its legislative function. Because the executive departments are subject to statutory regulation and to practical restrictions imposed through appropriations levels, Congress can usually demonstrate that it has a legitimate and proper need for the information necessary to make future regulatory and appropriations decisions in an informed manner. *McGrain*, 273 U.S. at 178.

As the Supreme Court has observed, however, the congressional power of oversight "is not unlimited." *Watkins*, 354 U.S. at 187.[20] It can be exercised only in aid of a legitimate legislative function traceable to one of Congress' enumerated powers. *See McGrain*, 273 U.S. at 173–74. The power of oversight

---

[16] U.S. Const. art. II, § 3.

[17] *In re Neagle*, 135 U.S. at 59.

[18] *Id.* at 64 (emphasis added).

[19] *Id.* That such a statute may have existed, *see* Expatriation Act of July 27, 1868, ch. 249, § 3, 15 Stat. 223, 224 (current version at 22 U.S.C. § 1732) (authorizing the President to use such means, short of war, as may be necessary to obtain the release of Americans unjustly held prisoner by foreign governments), does not diminish the force of the Supreme Court's statement that no such statute would be *needed* to support such an exercise of executive power.

[20] It is worth observing that Congress' oversight powers are no more explicit in the Constitution than are the President's powers in foreign affairs *See McGrain*, 273 U.S. at 161.

cannot constitutionally be exercised in a manner that would usurp the functions of either the Judicial or Executive Branches. Thus, the Supreme Court has held that by investigating the affairs of a business arrangement in which one of the government's debtors was interested, "the House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial." *Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881). The same principle applies to congressional inquiries that would trench on the President's exclusive functions. "Lacking the judicial power given to the Judiciary, [Congress] cannot inquire into matters that are exclusively the concern of the Judiciary. *Neither can it supplant the Executive in what exclusively belongs to the Executive.*" *Barenblatt* v. *United States*, 360 U.S. 109, 112 (1959) (emphasis added).[21]

It is undoubtedly true that the Constitution does not contemplate "a complete division of authority between the three branches." *Nixon* v. *Administrator of General Services*, 433 U.S. 425, 443 (1977). Nevertheless, there are certain quintessential executive functions that Congress may not exercise in the guise of its "oversight power." Congress, for example, may not give its own agents the power to make binding rules "necessary to or advisable for the administration and enforcement of a major statute." *Buckley* v. *Valeo*, 424 U.S. 1, 281 (1976) (White, J., concurring in part). Nor may Congress unilaterally alter the rights and duties created by a prior statutory authorization. *INS* v. *Chadha*, 462 U.S. 919, 951 (1983). In general, the management and control of affairs committed to the Executive Branch, even those given to the Executive by Congress itself, must remain firmly in the control of the President. *Myers* v. *United States*, 272 U.S. 52, 135 (1926). *A fortiori*, the conduct of affairs committed exclusively to the President by the Constitution must be carefully insulated from improper congressional interference in the guise of "oversight" activities.

This principle has three immediately relevant corollaries. First, decisions and actions by the President and his immediate staff in the conduct of foreign policy are not subject to direct review by Congress. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 164 (1803).[22]

Second, while Congress unquestionably possesses the power to make decisions as to the appropriation of public funds, it may not attach conditions to Executive Branch appropriations that require the President to relinquish any of

---

[21] On its facts, *Barenblatt* did not involve an inter-branch dispute. The Court upheld a contempt citation issued by a House Committee against a witness who refused to answer questions about his ties with the Communist Party.

[22] Obviously, Congress may investigate and consider the President's past actions when performing one of its own assigned functions (for example, while giving advice and consent to treaties or appointments, deciding whether to issue a declaration of war, or during the impeachment process).

his constitutional discretion in foreign affairs. Just as an individual cannot be required to waive his constitutional rights as a condition of accepting public employment or benefits, so the President cannot be compelled to give up the authority of his office as a condition of receiving the funds necessary to carry out the duties of his office.[23] To leave the President thus at the mercy of the Congress would violate the principle of the separation of powers in the most fundamental manner. *The Federalist* indicates that one great "inconveniency" of republican government is the tendency of the legislature to invade the prerogatives of the other branches, and that one of the main concerns of the Framers was to give the other branches the "necessary constitutional means and personal motives to resist [such] encroachments."[24] In an effort to address this problem, the Constitution provides that the President's personal compensation cannot be altered during his term of office,[25] and it must be acknowledged that the President's *constitutional* independence is even more precious and vulnerable than his personal independence.[26]

Third, any statute that touches on the President's inherent authority in foreign policy must be interpreted to leave the President as much discretion as the language of the statute will allow. This accords with well-established judicial presumption in favor of construing statutes so as to avoid constitutional questions whenever possible.[27] Because the President's constitutional authority in international relations is by its very nature virtually as broad as the national interest and as indefinable as the exigencies of unpredictable events, almost *any* congressional attempt to curtail his discretion raises questions of constitutional dimension. Those questions can, and must, be kept to a minimum in the only way possible: by resolving all statutory ambiguities in accord with the presumption that recognizes the President's constitutional independence in international affairs.

---

[23] The doctrine of unconstitutional conditions has pervasive application throughout the law. For a good general statement of the doctrine, *see Frost & Frost Trucking Co.* v. *Railroad Comm'n*, 271 U.S. 583 (1926):

> If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

*Id.* at 594.

[24] *The Federalist* No. 51, at 321–22 (J. Madison) (C. Rossiter ed. 1961).

[25] U.S. Const. art. II, § 1, cl. 7; *The Federalist* No. 51, at 321 (J. Madison) (C. Rossiter ed. 1961); *id.* No. 73, at 441–42 (A. Hamilton).

[26] *See* 41 Op. Att'y Gen. 230, 233 (1955):

> It is recognized that the Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted. It may also impose conditions with respect to the use of the appropriation, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution. If the practice of attaching invalid conditions to legislative enactments were permissible, it is evident that the constitutional system of the separability of the branches of Government would be placed in the gravest jeopardy.

[27] "[I]f 'a construction of the statute is fairly possible by which [a serious doubt of constitutionality] may be avoided,' a court should adopt that construction." *Califano* v. *Yamasaki*, 442 U.S. 682, 693 (1979) (quoting *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932)).

### III. Statutory Requirements that the President Report to Congress about his Activities Must Be Construed Consistently with the President's Constitutional Authority to Conduct Foreign Policy

In 1980, § 501(a) of the National Security Act of 1947 was amended to provide for congressional oversight of "significant anticipated intelligence activities." This section now provides:

> To the extent consistent with all applicable authorities and duties, *including those conferred by the Constitution upon the executive and legislative branches of the Government*, and to the extent consistent with due regard for the protection from unauthorized disclosure of classified information and information relating to intelligence sources and methods, the Director of Central Intelligence and the heads of all departments, agencies, and other entities of the United States involved in intelligence activities shall —
>
> (1) keep the Select Committee on Intelligence of the Senate and the Permanent Select Committee on Intelligence of the House of Representatives . . . fully and currently informed of all intelligence activities which are the responsibility of, are engaged in by, or are carried out for or on behalf of, any department, agency, or entity of the United States, including any significant anticipated intelligence activity, except that (A) the foregoing provision shall not require approval of the intelligence committees as a condition precedent to the initiation of any such anticipated intelligence activity, and (B) if the President determines it is essential to limit prior notice to meet extraordinary circumstances affecting vital interests of the United States, such notice shall be limited to the chairman and ranking minority members of the intelligence committees, the Speaker and minority leader of the House of Representatives, and the majority and minority leaders of the Senate.

50 U.S.C. § 413(a) (emphasis added). For situations in which the President fails to give prior notice under § 501(a), § 501(b) provides:

> The President shall fully inform the intelligence committees *in a timely fashion* of intelligence operations in foreign countries, other than activities intended solely for obtaining necessary intelligence, for which prior notice was not given under subsection (a) of this section and shall provide a statement of the reasons for not giving prior notice.

50 U.S.C. § 413(b) (emphasis added).[28]

The delicate connection between the "timely notice" requirement of § 501(b) and the President's inherent constitutional authority, acknowledged in § 501(a), is dramatically confirmed by a colloquy between Senators Javits and Huddleston, both of whom were on the committee that drafted this provision. Senator Javits asked: "If information has been withheld from both the select committee and the leadership group (as § 501(b) envisages), can it be withheld on any grounds other than 'independent constitutional authority' and, if so, on what grounds?" Senator Huddleston answered: "Section 501(b) recognizes that the President may assert constitutional authority to withhold prior notice of covert operation [sic], but would *not* be able to claim the identical authority to withhold timely notice under § 501(b). A claim of constitutional authority is the *sole* grounds that may be asserted for withholding prior notice of a covert operation." 126 Cong. Rec. 17693 (1980) (emphasis added).[29] If, as Senator Huddleston contended, § 501(b) is to be interpreted to require the President to act on his inherent authority in withholding notice of covert operations until after the

---

[28] Section 501 of the National Security Act does *not* contemplate that prior notice of "intelligence activities" will be given in all instances. Subsection (b) of § 501 makes specific provision for situations in which "prior notice was not given under subsection (a)." Because subsection (a) includes situations in which the President provides notice to the full intelligence committees under subsection (a)(1)(A) and situations in which he provides prior notice restricted to designated members of Congress, including the chairmen and ranking members of the House and Senate intelligence committees under subsection (a)(1)(B), it seems clear that subsection (b) contemplates situations in which no prior notice has been given under either of these provisions.

[29] A similar colloquy took place on the floor of the House between Representative Boland, Chairman of the House Select Committee on Intelligence, and Representative Hamilton:

    Rep. Hamilton: As I understand that subsection, it allows the President to withhold prior notice entirely: that is, he does not inform anyone in that circumstance. He only has to report in a timely fashion.

    Is that a correct view of subsection (b)?

    Rep. Boland: In response to the gentleman, let me say that the President must always give at least timely notice.

126 Cong. Rec. 28392 (1980). Thus, Representative Boland clearly, if reluctantly, confirmed Rep. Hamilton's interpretation. During the floor debates, several Senators also acknowledged that the proposed legislation did not require that Congress be notified of all intelligence activities prior to their inception. According to Senator Nunn, the bill contemplated that "in certain instances the requirements of secrecy preclude any prior consultation with Congress." 126 Cong. Rec. 13127 (1980) (statement of Sen. Nunn). *See also id.* at 13125 (statement of Sen. Huddleston) ("Section 501(b) recognizes that the President may assert constitutional authority to withhold prior notice of covert operations . . . ."); *id.* at 13103 (statement of Sen. Bayh).

    In the course of the floor debates, some Senators stated that the situations in which prior notice was not required would be very rare. *See, e.g.*, 126 Cong. Rec. 26276 (1980) (remarks of Sen. Inouye). Such statements are of little relevance to determining the scope of the prior notice requirement. First, the executive branch has always agreed that instances of deferred reporting will be rare and has consistently given prior notice. Second, § 501 at the very least permits the President to defer notice when he is acting pursuant to his independent constitutional authority; the scope of this authority is determined, not by legislators' view of the Constitution, but by the Constitution itself. Third, the draftsmen of § 501 decided that because the scope of the President's constitutional "authorities and duties" was in serious dispute, the legislation would not attempt to resolve the issues separating the parties to the dispute. *See* 126 Cong. Rec. 13123 (1980) (statement of Sen. Javits). The ambiguities of subsection (b) reflect Congress' *inability* to override the executive branch's view of the President's constitutional authority. That dispute cannot now be settled, contrary to the Executive's position, by reference to the statements of individual Congressmen who had a narrow view of the President's constitutional role.

172

fact,[30] then any further statutory limitations on the President's discretion should be narrowly construed in order to respect the President's constitutional independence. The requirement that such after-the-fact notification be made "in a timely fashion" appears to be such an additional limitation.

The entire analysis in this memorandum supports the proposition that the phrase "in a timely fashion" must be construed to mean "as soon as the President judges that disclosure to congressional committees will not interfere with the success of the operation." To interpret it in any other way — for example, by requiring notification within some arbitrary period of time unrelated to the exigencies of a particular operation — would seriously infringe upon the President's ability to conduct operations that cannot be completed within whatever period of time was read into the statutory provision.[31] Furthermore, several putatively discrete intelligence "operations" may be so interrelated that they should realistically be treated as a single undertaking whose success might be jeopardized by disclosure prior to its completion.[32]

Thus, a number of factors combine to support the conclusion that the "timely fashion" language should be read to leave the President with virtually unfet-

---

[30] Senator Huddleston's interpretation is not necessarily correct, because the President may be able to withhold prior notice even without invoking his independent constitutional authority.

[31] On the floor of the Senate, the bill's sponsor indicated that his personal view of the President's constitutional powers was very narrow, and that he wanted the relevant congressional committees notified "as soon as possible." He acknowledged, however, that the executive branch took a different view, and that he expected "that these matters will be worked out in a practical way." 126 Cong. Rec. 13096 (1980) (remarks of Sen. Huddleston). These statements show that the legislation was not thought to preclude the President from acting on his own view of his own constitutional powers. In guarding against such improper interference, the President's own interpretation of his constitutional powers "is due great respect" from the other branches. *See United States v. Nixon*, 418 U.S. 683, 703 (1974).

[32] In his prepared testimony on S. 2284, President Carter's CIA Director, Stansfield Turner, stated:

Prior reporting would reduce the President's flexibility to deal with situations involving grave danger to personal safety, or which dictate special requirements for speed and secrecy. On the other hand, activities which would have long term consequences, or which would be carried out over an extended period of time should *generally* be shared with the Congress at their inception, and I would have no objection to making this point in the legislative history.

*National Intelligence Act of 1980: Hearings before the Senate Select Comm. on Intelligence*, 96th Cong., 2d Sess. 17 (1980) (emphasis added). Turner's testimony cannot properly be interpreted to imply that all "long term," as opposed to "short term," projects require prior notice. First, Turner drew a distinction between projects involving great personal danger *or* requiring speed and secrecy and projects of long duration or with long term consequences. He did not address projects that are *both* long term *and* that involve danger to personal safety, such as the recent Iranian initiative. The inadvisability of prior reporting applies as forcefully to such a project as to "short term" projects that involve personal safety. Second, Turner was careful not to say that long term projects must always be reported at their inception: he said only that they will *generally* be so reported. In a colloquy with Senator Bayh concerning the word "generally," Turner stressed that "one has to be a little cautious" in making such a statement because "it will be quoted back from these hearings for years to come." *Hearings, supra*, at 32. Turner never stated that the Executive would or should give prior notice of all long-term projects. Third, a distinction between long and short-term projects would virtually force the President to prefer military to diplomatic initiatives in situations like the one at issue in this memorandum, which could not have been Congress' intent.

In any event, S. 2284 was not enacted, and the full Congress never had its attention directed to Turner's statements. Those statements are therefore not a significant aid in interpreting § 501(b). As we have shown, both the text of the statute and the colloquies on the floor of the House and Senate indicate that Congress did not require prior notice when the President was acting pursuant to his independent constitutional authority. In permitting "timely notice" in § 501(b), Congress made no distinction between long and short term projects, and no such distinction should be read into the statute.

tered discretion to choose the right moment for making the required notification. The word "timely" is inherently vague;[33] in *any* statute, it would ordinarily be read to give the party charged with abiding by a timeliness requirement the latitude to interpret it in a reasonable manner. Congress apparently thought that the notification requirement was meant to limit the President's exercise of his inherent authority, while at the same time Congress acknowledged the existence and validity of that authority. Because the President is in the best position to determine what the most reasonable moment for notification is, and because any statutory effort to curtail the President's judgment would raise the most serious constitutional questions, the "timely fashion" language should be read, in its natural sense, as a concession to the President's superior knowledge *and constitutional right* to make any decision that is not manifestly and indisputably unreasonable.[34] This conclusion is reinforced by the nature of intelligence operations, which are often exceptionally delicate undertakings that may have to extend over considerable periods of time. The statute's recognition of the President's authority to withhold prior notification would be meaningless if he could not withhold notification at least until after the undertaking as a whole was completed or terminated.[35]

---

[33] The statute uses a more precise phrase in § 501(a), where it requires that certain committees be kept "fully and currently informed" of activities not covered by § 501(b). This phrase was interpreted by the Senate Committee to mean that "arrangements for notice are to be made forthwith, without delay." S. Rep. No. 730, 96th Cong., 2d Sess. 9 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4192, 4199. No such interpretation was placed on the "timely fashion" language of § 501(b). *See id.* at 12, *reprinted in* 1980 U.S.C.C.A.N., at 4202–03.

[34] The legislative history of § 501(a) specifically indicated that "[n]othing in this subsection is intended to expand or to contract or to define whatever may be the applicable authorities and duties, including those conferred by the Constitution upon the Executive and Legislative branches." S. Rep. No. 730, 96th Cong., 2d Sess. 6 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4192, 4196. Furthermore, the Senate Committee acknowledged that it was "uncertain" about the distribution of powers between the President and Congress in the national security and foreign policy area. *See id.* at 9, *reprinted in* 1980 U.S.C.C.A.N., at 4199.

[35] Section 502 of the National Security Act, 50 U.S.C. § 414, generally limits the use of funds appropriated for intelligence activities to cases in which Congress has been given prior notice of the nature of the activities. Section 502(a)(2) allows expenditures when "in the case of funds from the Reserve for Contingencies of the Central Intelligence Agency and consistent with the provisions of section [501] concerning any significant anticipated intelligence activity, the Director of Central Intelligence has notified the appropriate congressional committees of the intent to make such funds available for such activity." This provision should be interpreted to allow the President to use funds from the Reserve for Contingencies in order to carry out operations for which he withholds notice in accord with § 501(b). Section 502(a)(2)'s specific reference to § 501 should be taken to give the President implicit authorization to withhold notification of the expenditure of funds just as he withholds notification of the operation itself: to read it otherwise would mean that § 502 had effectively, though impliedly, repealed § 501's acknowledgement of the President's independent constitutional authority.

It should be noted, however, that § 502(a)(2) is clumsily drafted; if read literally, it could be taken to suggest that Congress must always be notified in advance when funds appropriated for intelligence activities are to be used for covert operations. The Conference Committee commented on the language in question by noting that it did not expect situations to arise in which there would have to be prior notice under § 502 as to the funding of an activity that did not itself have to be reported under § 501; the Committee also indicated that if such a situation were to arise, it should be resolved in a spirit of "comity and mutual understanding." H.R. Conf. Rep. No. 373, 99th Cong., 1st Sess. 19 (1985), *reprinted in* 1985 U.S.C.C.A.N. 952, 961–62. *Accord* S. Rep. 79, 99th Cong., 1st Sess. 5 (1985). Similarly, the House Committee Report indicated that "the same event . . . can be treated in the same way under new Section 502(a) and Section 501." H.R. Rep. No. 106 (Part 1) 8 (1985), *reprinted in* 1985 U.S.C.C.A.N. 952, 954. This supports the reasoning outlined above.

## Conclusion

Section 501(b) of the National Security Act of 1947 must be interpreted in the light of § 501 as a whole and in light of the President's broad and independent constitutional authority to conduct foreign policy. The requirement that the President inform certain congressional committees "in a timely fashion" of a foreign intelligence operation as to which those committees were not given prior notice should be read to leave the President with discretion to postpone informing the committees until he determines that the success of the operation will not be jeopardized thereby. Because the recent contacts with elements of the Iranian government could reasonably have been thought to require the utmost secrecy, the President was justified in withholding § 501(b) notification during the ongoing effort to cultivate those individuals and seek their aid in promoting the interests of the United States.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*